**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ALFRED G. KING,

　　　　　*Plaintiff-Appellant,*

v.

DONALD RUMSFELD, Secretary,
United States Department of
Defense,

　　　　　*Defendant-Appellee.*

No. 02-1313

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-01-1152-A)

Argued: February 24, 2003

Decided: May 8, 2003

Before WILKINS, Chief Judge, and LUTTIG and
GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Chief Judge Wilkins joined. Judge Gregory wrote an opinion
concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Susan M. Andorfer, SUSAN M. ANDORFER, L.T.D.,
Belleville, Illinois, for Appellant. Rachel Celia Ballow, Assistant
United States Attorney, Alexandria, Virginia, for Appellee. **ON**

**BRIEF:** Carolyn P. Carpenter, CARPENTER LAW FIRM, Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

LUTTIG, Circuit Judge:

Appellant Alfred G. King appeals the district court's order granting summary judgment in favor of his former employer, the United States Secretary of Defense, on his race and sex discrimination and retaliation claims brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17. Because King has not presented a prima facie case as to his race and sex discrimination claims and because he has not overcome his employer's asserted legitimate motive in terminating him with respect to his retaliation claims, we affirm.

I.

The relevant facts of this case are straightforward. In 1996, King, a black man, was hired as a teacher by the Department of Defense (DOD) Dependent Schools, subject to a two-year probationary period. During the time of his probationary employment, King was reprimanded and counseled on multiple occasions by different superiors for using profanity around the students and for belittling them. King's first supervisor, Thomas Whitaker, was the first to take notice of and to confront King about this behavior. When Whitaker took medical leave, his successor, Douglas Carlson, heard similar reports of King's unsuitable conduct and similarly reprimanded and counseled King.

Because King was a probationary teacher and because his conduct concerned Carlson, Carlson began to review other aspects of King's work, including his lesson planning. Ultimately, Carlson concluded that King's job performance was inadequate, as reflected by his lesson planning, among other factors.[1] Carlson shared his conclusion

---

[1]For example, in one particular instance, King left identical worksheets for three different classes at different grade levels when he had to be absent. Carlson concluded that the uniform worksheet for such disparate classes reflected inadequate preparation on King's part.

with King and counseled him as to how he might improve his performance. Following a subsequent performance review — which this time culminated with Carlson telling King he could be terminated based upon his performance — Carlson received notice from the DOD Office of Complaint Investigations that King had filed an Equal Employment Opportunity (EEO) complaint against him.

Before Carlson took any definitive action with respect to King's employment, Whitaker returned from his medical leave. Upon returning, Whitaker met with Carlson to discuss King's performance. Whitaker reviewed the many notes Carlson kept of his conferences with King and of King's job performance. Whitaker then met with King on two occasions and asked King to explain his side of the events that occurred while Whitaker was away. Following these meetings, Whitaker decided to evaluate King himself before making a decision regarding his termination. Whitaker observed King's classes on several occasions and talked to several of King's students. Following his own review, Whitaker decided to terminate King prior to the end of his two-year probationary period.

King then brought this action alleging that he was terminated for discriminatory motives and that his termination was a retaliatory action against him for filing an EEO complaint. To support his claim, King proffered evidence (1) that another probationary teacher, a white man, whose conduct had generated complaints from students and parents was not fired;[2] (2) that Carlson picked on him; (3) that a substitute teacher had been pressured by Carlson into providing a critical review of King after substituting for him; (4) that upon learning of King's EEO complaint Carlson said to him, "[t]hat's what you people always say when you screw up;" and most importantly, as will quickly become evident, (5) that other teachers at the school considered King's lesson plans not to be substantially different from their own plans.

Upon motion for summary judgment, the district court granted judgment to appellee. The court determined that King's proffer failed

---

[2]The record, however, also discloses that this teacher, who had been asked not to tickle the students after two reported incidents of such, corrected his behavior following reprimand, unlike King.

to establish a prima facie case of race or sex discrimination because it did not contain evidence that King's job performance was satisfactory at the time of his discharge. The court also determined that King failed to establish a prima facie retaliatory discharge claim.

## II.

We review an award of summary judgment *de novo*. *Higgins* v. *E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). We view the evidence in the light most favorable to the non-moving party. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.

To establish a prima facie case of discriminatory discharge, King must show: (1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class. *See Brinkley* v. *Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999). This case turns on King's inability to demonstrate the third factor —that at the time of his discharge he was performing at a level that met appellee's legitimate expectations.

Appellee offered substantial evidence that King was not in fact meeting legitimate job performance expectations, chronicling in detail King's poor performance and his supervisors' numerous concerns. King's response to appellee's evidence is limited to his own claim of satisfactory job performance and to testimony he elicited from his fellow teachers to the effect that his lesson plans were substantially comparable to their own. Neither testimony can sustain a challenge to appellee's proffer that King was not in fact meeting *appellee's* legitimate performance expectations.

King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting appellee's expectations. *See Evans* v. *Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citations omitted)). Nor can the fact testimony of King's co-workers that his lesson plans were comparable to theirs establish this genuine issue. Proof that King's performance was comparable to his co-workers' is *not* proof that King's performance met appellee's legitimate job performance expectations. It is *only* proof that his work looked like that of his co-workers, a fact that, without more, does not bear on the critical inquiry.[3] For this reason we have long rejected the relevance of such testimony and held it to be insufficient to establish the third required element of a prima facie discrimination case. *See*, *e.g.*, *Hawkins* v. *Pepsico, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of Hawkins' co-workers as to the quality of her work are [ ] close to irrelevant." (citation omitted)); *Tinsley* v. *First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) ("[A]lthough the affidavits put forth by Tinsley document the *fact* that certain co-workers, Bank customers, and attorneys believed Tinsley was doing a good job, they fail to address whether management honestly believed that Tinsley was doing a good job." (emphasis added)).

The irrelevance of King's co-workers *as fact witnesses* does not, as King contends, foreclose employees like him from ever proving a prima facie case of race and sex discrimination. King argues that our rule only allows employees to satisfy the prima facie standard in the unique, and employer-controlled, circumstance where the employer either (1) concedes that the employee was performing satisfactorily at the time of discharge, or (2) has previously given the employee positive performance reviews that establish this third element. But such is not the case. For King to establish that his work met appellee's legitimate job performance expectations he had only to offer qualified expert opinion testimony as to (1) appellee's legitimate job perfor-

---

[3]That King's co-workers thought his work substantially similar to their own is simply not the smoking gun King believes. By way of example, the co-worker's testimony, taken as fully accurate, might simply reflect that their job performance too was lacking.

mance expectations and (2) analysis and evaluation of King's performance in light of those expectations.

It is not inconceivable that a plaintiff's co-workers could qualify as expert witnesses to testify as to their employer's legitimate job performance expectations and as to their own analysis and evaluation of the plaintiff's performance in light of those expectations. But King never proffered his co-workers in this capacity. And, even had the co-workers been so proffered, their testimony never touched on either of these two critical inquiries. King's co-workers' testimony was limited to the fact observation that King's lesson plans looked like theirs, and, arguably, to the fact that *they* believed King's work met appellee's expectations. Since testimony as to the fact that King's work looked like that of his co-workers, or even as to the fact that they believed his work met appellee's expectations, does not establish what expectations appellee could legitimately have, it cannot begin to answer the first step of the inquiry. Nor, obviously, can it answer the second step of the inquiry — an evaluation of King's work under appellee's as-of-yet unidentified legitimate expectations. Failing to address what expectations of King appellee could legitimately maintain and failing to analyze King's work in light of such opined expectations, the co-workers' fact testimony cannot build a prima facie case for King.[4]

Because King cannot establish that his job performance satisfied appellee's legitimate expectations, and so cannot establish a prima facie case, his other allegations — that a similarly situated white, probationary teacher was not fired after complaints were raised about him, and that Carlson picked on him, asked a substitute to critique him, and ultimately told him "[t]hat's what you people always say when you screw up" — are irrelevant to the inquiry. These allega-

---

[4]King's argument is really no more than an argument for the admissibility of expert opinion testimony from unqualified, non-expert witnesses. For, King's conclusion — that the fact that his co-workers thought he met appellee's expectations is probative of whether he did meet those expectations — necessarily relies on the implicit assumption that the co-workers' have reliable and admissible (*i.e.*, expert) opinions as to what expectations appellee could legitimately maintain and as to whether analysis of King's work shows satisfactory performance under those expectations.

tions, as King recognizes, go to the issue of whether appellee's explanation of King's discharge is pretextual. But, since King never established a prima facie case as to his discrimination claims, appellee is under no duty to supply an explanation for King's discharge. *See Brinkley*, 180 F.3d at 607 ("*Once the prima facie case is established, the burden shifts to the employer* to articulate a legitimate, nondiscriminatory reason for the adverse employment action." (emphasis added)). Because appellee is freed from having to justify the discharge (with respect to the discrimination claims), King's evidence-in-waiting, prepared to rebut any justification, is of no moment.

### B.

The district court also concluded that King failed to make out a prima facie case of retaliatory discharge. We disagree. We conclude that King did indeed make out a prima facie case of retaliation. However, appellee offered a legitimate, non-retaliatory motive for King's termination, as to which proffer King has not offered evidence of pretext.

To make out a prima facie case of retaliation, King must show (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *See Williams* v. *Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1999). Here, King's filing of the EEO complaint was protected activity, and his termination indisputably constituted adverse employment action. Moreover, that his termination came so close upon his filing of the complaint gives rise to a sufficient inference of causation to satisfy the prima facie requirement. *See id.* ("Appellant's proof of a causal connection between the protected activity and her discharge was that she was fired after her employer became aware that she had filed a discrimination charge. While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.").[5]

---

[5]King's firing came two months and two weeks following Carlson's receipt of notice that King had filed an EEO complaint with DOD's Office of Complaint Investigations. This length of time between Carl-

Appellee, however, proffered a legitimate, non-retaliatory discharge motive — that King was not meeting appellee's job performance expectations — after King shifted the burden to it by establishing his prima facie case. *See id.* ("Once this prima facie evidence [of retaliatory discharge] is established, it must be rebutted by legitimate nonretaliatory reasons[.]"). Appellee thus shifted the burden back to King with his proffer. *See Womack* v. *Munson*, 619 F.2d 1292, 1296 (4th Cir. 1980) (following the employer's proffer of a legitimate, non-retaliatory reason for an adverse employment action the burden of persuasion remains with the plaintiff to prove that the employer's reason is pretext, a cover-up for retaliation).

None of King's various allegations — that a similarly situated white, probationary teacher was not fired after complaints were raised about him, and that Carlson picked on him, asked a substitute to critique him, and ultimately told him "[t]hat's what you people always say when you screw up" — *contradict* appellee's proffered discharge motive.

Nor are they probative in the manner that the dissents suggests. For example, the dissent says:

> [T]hat Whitaker was aware of reports of ongoing misconduct by Moore — post reprimand . . . establishes a solid basis for the permissible inference . . . that the administrators knew that Moore's misconduct continued beyond reprimand[.]

*Post* at 16. But, evidence that a parent wrote to the school to complain about this other teacher after that teacher was reprimanded cannot

---

son's notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events. Yet, in the context of this particular employment situation, this length of time does not undercut the inference of causation enough to render King's prima facie claim unsuccessful. Here, Carlson and Whitaker committed to ongoing reviews of King's performance that set the end of the academic school year as the natural decision point, thus making likely that any discharge, lawful or unlawful, would come at that time.

establish that King and that teacher were similarly situated. To establish that King and that teacher were similarly situated, King must proffer evidence that *school administrators believed* that the other teacher had, like King, continued his misconduct beyond reprimand. To prove this, either King must directly proffer evidence of the administrators' beliefs, or he must proffer evidence that the other teacher's misconduct did in fact continue beyond reprimand. Of course, the latter proof form is relevant only insofar as it might make possible the inference that despite the administrators' protestations to the contrary, they did in fact know about the misconduct.

King does not present the first form of proof here — testimony that the administrators believed the two teachers were similarly situated in the relevant respect. The administrators testified they believed the other teacher had ceased his misconduct. King proffered no evidence to contradict their testimony directly. The letter from the vexed parent that the dissent cites does not, and cannot, directly establish that the administrators thought as the parent thought. It establishes only that the administrators were informed as to the parent's thoughts. Indeed, that very letter reports that the administrators disagreed with its author and believed the other teacher had ceased his misconduct.

The second form of proof — proving by inference from the fact that the other teacher's misconduct had continued beyond reprimand that the administrators knew such to be the case — is not met here either. The only evidence King proffers on this score is the same letter as discussed above. King argues, in essence, that the letter proves two different facts: (1) that the teacher did in fact continue his misconduct beyond reprimand; and (2) that the administrators were given knowledge of this fact. It should be readily apparent that until evidence that can establish the fact of continuing misconduct is proffered, the letter cannot establish the second fact. For if there is no proof that the misconduct continued, the letter cannot establish that the administrators were given knowledge that it continued since the foundation of any such knowledge is the actual fact that the misconduct continued.

The letter, however, cannot establish that the misconduct in fact continued. As an initial matter, the letter-writer concedes he is a parent of a child who had *not* been inappropriately touched by the teacher following his reprimand. *See* J.A. at 333-34. Consequently,

the aspect of the letter to which King, and the dissent, cling is the hearsay assertion by that parent that another parent's child had been inappropriately touched after the teacher's reprimand. The letter writer claimed to have "learned" of that alleged instance (and most importantly of the time it occurred) via a hearsay report from his son. He did not learn of the incident (and again, most importantly, of the time it occurred) from either the allegedly inappropriately touched child or from the parent of that child. Indeed, the letter-writer notes that in another hearsay conversation with the parent of the allegedly touched child, while the parent of that child confirmed his child had been "poked," he could not confirm that such had occurred *after* the teacher had been reprimanded. *See* J.A. at 333. Furthermore, and of greatest import, King proffered no evidence either from the student who was allegedly poked after the teacher's reprimand, or from that student's parent. And, we note as well, neither *that* student nor his parents filed a complaint with the school alleging that the student was inappropriately touched following Moore's reprimand. There is thus no reliable, proffered basis on which to conclude that the teacher's misconduct continued past reprimand.

Since the letter cannot establish the fact of continuing misconduct, and since no other evidence was presented to establish this fact, the letter cannot establish that it gave the administrators knowledge of such a fact. With no valid evidentiary basis on which to infer that the administrators knew, despite their denial, that the other teacher's misconduct continued, King cannot establish inferentially that he was similarly situated to that other teacher.

Likewise, the dissent places too much weight on the testimony by Donna Fontenot (a substitute teacher at the school) that *Carlson* asked her to be "critical" of, or make "derogatory comments" about, King's lesson plans in her post-substituting evaluation forms. *See* J.A. at 381. As an initial matter, that an employer asks, or even coerces, a subordinate to evaluate another's work critically is not sufficient on its own to establish evidence of pretext. Employers are entitled to demand that subordinates provide critical reviews of their employees when such are justified by sub-par work. And, even if Carlson's demand of Fontenot is the least bit probative that he harbored an unlawful motive for firing King and so desired that she provide a pretext under which he could fire him, the fact is that Carlson did not fire King. *Whitaker*

fired King *after conducting his own independent investigation* of the matter, and after Carlson had left the school. No evidence links to Whitaker the motive King uses Fontenot's testimony to ascribe to Carlson. Since Carlson did not fire King, and since any motive Carlson had for pressuring Fontenot is not attributable to Whitaker, Fontenot's testimony could only be relevant if the record contained evidence that Fontenot provided reviews of King's work that falsely attributed sub-par performance to him and that King was fired at least partially on that basis. But, the record contains no suggestion at all that the reviews Fontenot provided were in any way inaccurate reviews of King's work.

The dissent also points to King's co-worker testimony as evidence that King was treated differently than similarly situated colleagues. But again, for similar reasons as governed our discussion in section II.A., *cf. infra* pp. 4-7, the opinion of King's colleagues that his work was equivalent to theirs is probative only of the fact that *those* co-workers believed their work was equivalent to his. It is *not* probative of whether King's work *actually* was equivalent to theirs, and thus of whether King *actually* was similarly situated to them. For King to prove that he was similarly situated to his colleagues in terms of his job performance would, in the absence of evidence to that effect from the employer or its job performance reviews, require an expert to form an opinion based on reasoned analysis as to how King and the other teachers were performing and as to how their performances measured against one another. Such is not the stuff of lay, fact testimony. *Compare* Fed. R. Evid. 701 (opinion testimony by lay witnesses allowed only where that opinion is "rationally based on the perception of the witness," and not where the opinion is based on "specialized knowledge"), *with* Fed. R. Evid. 702 (Testimony by Experts). Thus, just as it would take an expert witness to provide an opinion as to whether any given teacher had met legitimate job performance expectations, as the dissent agrees, *see post* at 13, 17, so too it would take an expert to provide an opinion as to whether any given teacher's work was equivalent to that of another teacher's.

Though the dissent would rely upon *Conkwright* v. *Westinghouse Electric Corp.*, 933 F.2d 231 (4th Cir. 1991), to reach the contrary conclusion, that case does not support the dissent. In *Conkwright*, we considered the employment discrimination claims of a worker who

was laid off after his employer enacted firm-wide cutbacks by first rating all its employees, and then discharging those on the bottom of the ratings list. Conkwright's co-workers testified that they thought he did a good job, that he did not deserve his ratings, and that he did not deserve to get laid off. We concluded that this co-worker testimony was close to irrelevant, but in dicta in a footnote observed that:

> It is only close to irrelevant because if the ratings were wildly out of line with other indicia of an employee's performance then one may question whether the rating system has a bias in its implementation. But that is not the case here.

*Id.* at 235 n.4.

As is readily apparent from the language of that footnote, we were there concerned with the *relevance* of "indicia of an employee's performance" in an inquiry as to pretext. We did not there address the *reliability* of co-worker testimony as a means of proving that an employee's work performance was either adequate or that it was equivalent to that of other workers.

Here, we accept that indicia of King's performance might be relevant to the pretext inquiry. But, as explained above, King has not proffered any reliable and admissible testimony as to such indicia, and King cannot qualify the testimony of his co-workers as a reliable assessment of the relative competence of him and his co-workers. The dissent's effort to backdoor the co-worker testimony into the case under *Conkwright* thus fails and King may not ground his proof of pretext on such testimony.

For all the reasons given above, none of the evidence King proffers is sufficiently demonstrative of retaliatory intent to establish that the *unrebutted* poor performance discharge motive is pretext. As a result, King's proffer is insufficient for his action to survive appellee's motion for summary judgment. And while the district court improperly found King not to have made out a prima facie case, it properly granted summary judgment for appellee.

*CONCLUSION*

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I join the majority's opinion with respect to King's failure to establish a prima facie case of discriminatory discharge. As the majority finds, King has not adduced sufficient evidence of satisfactory performance vis-a-vis his employer's legitimate expectations to survive summary judgment. Additionally, I concur in the majority's reversal of the district court's conclusion that King failed to make out a prima facie case of retaliatory discharge. However, for the reasons that follow, I dissent from the majority's conclusion that King's allegations of discriminatory treatment are insufficient to create a genuine issue of material fact with respect to pretext.

The majority identifies King's allegations regarding differential and discriminatory treatment at the hands of his employer. The majority then posits that this treatment, even if assumed to be true, fails to contradict the Secretary's proffered discharge motive. To survive summary judgment, however, King need not squarely rebut his employer's explanation. Instead, King must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing. As a basic proposition, it is not terribly difficult to imagine a workplace where, confronted with a group of underperforming employees, an employer who is improperly motivated by discriminatory and retaliatory animus, singles out the minority employee for firing after he files a complaint. Because he has made out a prima facie case, if King also has cast doubt upon the real motivations behind his unique treatment, he has adduced sufficient evidence to survive summary judgment.

In *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000), a panel of this Court addressed the exact nature of the evidence neces-

sary to establish pretext. Writing for the Court, Judge Wilkinson noted, "[I]nstead of producing evidence that shows [ ][the employer's] assessment of [ ][the employee's] performance was dishonest or not the *real reason* for her termination — as the law requires — [ ][the employee] disputes the merits of [ ] [the] evaluations." *Id.* (emphasis added). In *Hawkins*, the employee simply took issue with the employer's assessment of her performance deficiencies. The Court required that the employee actually offer some evidence suggesting that an alternative reason existed for the termination. In *Hawkins*, beyond the employee's self-serving and conclusory allegations of racism, there was no such evidence. Hence, in reviewing for pretext at the summary judgment stage, we should assess whether the plaintiff has adduced evidence sufficient to create a genuine doubt in the mind of a reasonable jury regarding the veracity of the proffered justification. Our analysis must be limited to whether the evidence is competent and sufficient to create a genuine issue of material fact for the jury to resolve — as opposed to whether the evidence will overcome cross-examination and the rigors of trial to carry a jury. King maintains that he was treated *differently* than his similarly situated co-employees. To support this proposition, he offers several factual illustrations, which I find genuinely troubling and deserving of a jury's consideration.

In an age in which schools are acutely aware of the dire consequences that may follow from allegations of inappropriate touching of students by teachers, one would expect school administrators to respond rapidly and decisively to any such allegation. Yet, it is precisely in this highly charged context that we observe a case of laissez-faire and differential treatment by the school. Specifically, I am disturbed by the differential treatment of King's white co-worker, Richard Moore, who violated the school's policies by inappropriately poking and tickling students, yet was not terminated, nor even formally written-up for the incident.

The Secretary claims that Moore stopped his objectionable conduct once warned, yet King proffers evidence that undermines this defense. To wit, King offers the testimony of Robert Inaba, whose son Keith had been inappropriately touched by Moore throughout the year. *See* J.A. at 333-334. Inaba brought this conduct, along with other complaints regarding Moore, to the attention of Whitaker during a June 2, 1997 meeting. *Id.* Whitaker acknowledged that another par-

ent had notified him of similar misconduct, and indicated that he had already counseled Moore regarding the inappropriate touching. During the same meeting, once Moore had left the room, Whitaker assured Inaba that, "[Moore] should not have touched any students within the last seven days." *Id.* When Inaba returned home and related Whitaker's assurance that the inappropriate touching would stop, his son informed him that Moore had touched another student, Damon Dukes, earlier that very day. On the morning of June 3, 1997, Inaba telephoned Whitaker and related his son's report of the ongoing touching, which clearly undermined his assurances. *Id.* Whitaker stated that he would investigate the matter. After follow-up conversations with Whitaker on June 4 and June 6, Inaba reported that Whitaker's investigation of the matter was limited to asking a third-party whether he too had observed the June 2 touching. *Id.* Whitaker did not ask the alleged victim of Moore's conduct about the incident. Finally, frustrated with Whitaker's apparent unwillingness to take his concern seriously, Inaba contacted Damon Dukes' father on June 9. During this conversation, Mr. Dukes confirmed that the touching had occurred sometime during the previous week, although he could not specify precisely when it occurred. *Id.*

The majority argues that to prove that King and Moore were similarly situated for purposes of discipline, King would have to show that Moore's misconduct continued beyond reprimand, which would permit the inference that the administration did in fact know of the continuing misconduct. *Supra* at 9. The majority turns to the Inaba incident discussed above and concludes that it does not demonstrate that the misconduct continued beyond the reprimand. *Id.* at 10. However, this conclusion simply does not follow from the relevant facts. The majority notes that Inaba learned of the incident on June 2 through his son, rather than from Damon Dukes or his father. The majority then acknowledges that Inaba spoke to Mr. Dukes, and confirmed that Damon had been touched. The majority places great emphasis upon its observation that Mr. Dukes did not indicate that the touching had "occurred *after* the teacher had been reprimanded." *Id.* Finally, the majority notes that neither the victim nor his parent filed a complaint alleging the touching. Hence, according to the majority, there is no basis upon which the inference of knowledge of continued touching may rest.

Indeed, Inaba's letter reports no express confirmation by Mr. Dukes that his son had been touched after the reprimand. However, Inaba's letter does not report that he requested such a confirmation. Indeed, Inaba relates that Mr. Dukes indicated that his son had been touched sometime during the previous week. *See* J.A. at 333. This conversation occurred on June 9, 1997. Hence, we can assume that the touching occurred sometime on or after June 2, 1997. However, on June 2, 1997, Whitaker had assured Inaba that he had already spoken to Moore regarding the touching, and that he should not have touched any student within the last seven days. It is hardly a great leap to infer from this that Whitaker was on notice regarding the reported touching by Moore during late May 1997. Therefore, Inaba's June 3, 1997 report to Whitaker regarding an incident alleged to have occurred on June 2, 1997, establishes that Whitaker was aware of reports of ongoing misconduct by Moore — *post-reprimand*.

This fact establishes a solid basis for the permissible inference, to adopt the majority's logical approach, that the administrators knew that Moore's misconduct continued beyond reprimand, yet failed to discipline him as they would ultimately discipline King. Hence, King has established a genuine issue of material fact warranting a jury's consideration of differential treatment. The majority validly observes that Inaba's testimony is indirect, that neither Damon Dukes nor his father filed a complaint, and we might well expect the Secretary to present just such a challenge to King's evidence at trial. However, we must limit our inquiry at present to whether King may survive summary judgment, not prognosticate whether his evidence will ultimately sway a jury. King's evidence of the differential treatment vis-a-vis his white colleague alone constitutes sufficient evidence of pretext to deny summary judgment.

However, King offers significant proof beyond the Moore incident from which we may infer that he was treated differently by his employer. For instance, King offers the testimony of Donna Fontenot, a substitute teacher at the school, who testified that she was coerced by Carlson to prepare reviews denigrating the quality of King's lesson plans. *See* J.A. at 381-83. Fontenot testified that she felt pressured, at the risk of losing future teaching assignments, to produce a negative evaluation of King's work. *Id.* The majority dismisses this testimony because it was Whitaker, rather than Carlson, who made the ultimate

decision to discharge King. Thus, according to the majority, any unlawful motive that legitimately could be inferred from Carlson's coercive campaign to "paper" the record with negative reviews, cannot serve as a basis for pretext unless King proffers evidence that Fonteno's reviews were false and that he was fired, at least in part, on that basis. *Supra* at 11.

The majority seems to assume that Fontenot's reviews should be read independently of the circumstances under which they were produced. By insisting that King demonstrate that Fontenot's reviews "falsely attributed sub-par performance to him," *supra* at 11, the majority returns again to its insistence that King demonstrate the merits of his performance. However, as noted above, King need not squarely rebut his employer's performance-based explanation. Instead, he must introduce evidence casting doubt upon the proffered explanation. It is to this end that Fontenot's testimony should be directed. That a teacher was coerced to denigrate the work of her colleague, contrary to her true impressions and beliefs, must at least raise genuine issues concerning the credibility of Carlson's putative meritocractic zeal. Although Carlson did not make the ultimate decision to fire King, these coerced reviews were part of King's teaching record. Of course, as the majority emphasizes, Whitaker asserts that he discharged King after conducting his own independent investigation of the case. However, a jury need not blindly accept this version of events, and may rightfully infer that Whitaker's decision may have been tainted by Carlson's misconduct — evidence of which abounds. The Fontenot testimony reveals differential treatment, whereupon a jury may legitimately discount the reviews as a pretext for the employer's true unlawful motive.

Finally, the majority dismisses King's proffer of co-worker testimony regarding the similarity of his work to their own. According to the Court, King may only establish the equivalence of his work by introducing expert testimony to this effect. *Supra* at 11. I agree with the majority that King would require expert testimony to establish that his work met the legitimate expectations of his supervisor; however, it hardly follows *a fortiori* that he must adduce expert testimony to demonstrate the *similarity* of his work product to that of his co-workers.

As we have recognized, "[A] lay witness in a federal court proceeding is permitted under Fed. R. Evid. 701 to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990)(quoting *Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)). Although lay opinion testimony was once disfavored and presumed excludable, "The modern trend favors the admission of opinion testimony, provided that it is well-founded on personal knowledge [as distinguished from hypothetical facts] and susceptible to specific cross-examination." *Id.* (alteration in original) (quoting 3 J. Weinstein, Evidence ¶ 701[02] at 701-9 and 701-17 (1978)). However, the testimony of such a witness is limited to those opinions or inferences which are: 1) rationally based upon the perception of the witness; 2) helpful to a clear understanding of the testimony or the determination of a fact in issue; and 3) not based upon knowledge within the scope of Rule 702. Fed. R. Evid. 701. Additionally, we must be on guard to prevent lay opinion testimony when it involves "meaningless assertions which amount to little more than choosing up sides." *Mattison v. Dallas Carrier Corp.*, 947 F.3d 95, 110-11 (4th Cir. 1991) (quoting Fed. R. Evid. 701, Advisory Committee Note).

Although the contours of Rule 701 might upon first inspection appear straight-forward, considerable subtlety is often required to avoid the mischaracterization of competent lay opinion. *See, e.g.*, *MCI Telecommunications*, 897 F.2d at 706 (citing district court's error in treating proper lay opinion as expert testimony where witness offered profit projections based upon her personal knowledge of company's books); *Winant v. Bostic*, 5 F.3d 767, 772 (4th Cir. 1993) (noting that sometimes the characterization of testimony as opinion evidence may be misleading when the focus should be upon rational inferences drawn from facts of which the witness has personal knowledge). Accordingly, courts have admitted lay opinion testimony under Rule 701 that goes well beyond the classic confines of physical perception, and which requires the exercise of judgment solidly grounded in personal knowledge. *See, e.g.*, *United States v. Fowler*, 932 F.2d 306, 312 (4th Cir. 1991) (admitting lay opinion that defendant knew rules about treatment of classified documents, upon foundation that witnesses were familiar with the documents, their classification and reasons therefor, and the nature of the defendant's work); *MCI Tele-*

*communications*, 897 F.2d at 706 (profit projections based upon personal knowledge of company's finances admissible under Rule 701); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (upholding admission of lay opinion from plaintiff's owner as to damages, which was based upon personal knowledge and participation in affairs of business, even if witness relied in part upon report prepared by outside accountant in preparing opinion); *United States v. Westbrook*, 896 F.2d 330, 335-336 (8th Cir. 1990) (permitting ex-users to testify as to the identity of a controlled substance based upon their past experience with same). What we may derive from these cases is that the opinion testimony is not admitted due to the "specialized knowledge," which should be reserved for experts under Rule 702, but because of the particularized knowledge of a witness by virtue of his personal experience in a field (legal or not).

The majority's treatment of the distinction between lay and expert opinion does not do justice to the subtleties of the problem. The majority oversimplifies this evidentiary issue when it asserts that King would require an expert witness to "form an opinion based on reasoned analysis as to how King and the other teachers were performing and as to how their performances measured against one another." *Supra* at 11. King has adduced substantial evidence from his fellow teachers to the effect that their lesson plans were similar. Each of these teachers and substitute teachers had ample personal knowledge of the subject matter. To allow one teacher to introduce the opinion that his or her colleague's lesson plan "looks similar," as so many of King's co-workers have testified, would hardly hazard setting Rule 701 adrift from its prudential moorings. If a business owner or bookkeeper, testifying as a lay opinant, may offer such seemingly "specialized" insights as profit projections and damage reports, surely an elementary school teacher can compare two lesson plans, of which he or she has personal knowledge, without qualifying as an expert. Likewise, if an amphetamine aficionado may offer lay opinion comparing powdery substances of unknown provenance, I do not see why a teacher must be treated as an expert to compare the appearance of similar lesson plans. Ultimately, King's proffer of comparative testimony goes not to the merits of the subject work-product, nor to the legitimate expectations of an elementary school supervisor, but simply seeks to establish the similarity of two items of evidence, both of which are personally familiar to the proposed opinant. Therefore, our

analysis of pretext should proceed upon the premise that King has demonstrated a genuine factual question as to whether his work-product is comparable to that of his colleagues. The ultimate determination of equivalence, of course, should be reserved for the jury.

Finally, I would take this opportunity to comment upon this Circuit's precedent, which has been cited by the majority to emphasize our traditional reluctance to employ the testimony of co-workers to establish performance merit in unlawful discharge cases. *Supra* at 5. Indeed, as the majority correctly explained, an employee may not introduce the testimony of his co-workers to establish his satisfaction of his supervisor's legitimate performance expectations. *See Hawkins*, 203 F.3d at 280; *Tinsley*, 155 F.3d at 444. I joined the majority's opinion regarding King's discriminatory discharge claims precisely in light of such precedent. However, we are now forced to resolve a separate question altogether: does King's evidence of comparable work product demonstrate differential treatment by his employers?

The opinion testimony of King's peers establishes a genuine question of fact regarding the equivalence of his work product to that of his peers. This evidence does not establish that his work was meritorious, nor could it under our precedent. We have had occasion, in noting the narrow relevance of co-worker testimony regarding the quality of a plaintiff's work product, to allow for the admission of such opinion in order to demonstrate the possibility of implementation bias in an otherwise objectively designed review scheme. *See Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 235 n.4 (4th Cir. 1991). In *Conkwright*, we acknowledged that an "objective" employee rating system, might be manipulated to generate a neutral looking basis for discharge. In such a scenario, where co-workers testified that the employee did not deserve the ratings he received, we observed that their testimony could be relevant to an argument of pretext. The majority concedes that such "indicia of King's performance might be relevant to the pretext inquiry," *supra* at 12, but goes on to conclude that King failed to proffer admissible testimony as to such indicia. Obviously, in light of my discussion of Rule 701, I disagree with this assessment. King's co-workers' testimony is an indicator of the equivalence of his performance, and lays the foundation for the inference that by being singled out for discharge, he was treated differently on the basis of race, rather than performance.

Ultimately, we must recall that we are asked to assess whether King has raised a genuine issue of material fact on the question of pretext. On my review of the evidence, I cannot escape the conclusion that he has done so. I therefore respectfully dissent from the part of the majority's opinion affirming the district court's summary judgment on King's retaliatory discharge claim.