**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1231**

BETTY MOTICKA,

                                        Plaintiff - Appellant,

        versus

WECK CLOSURE SYSTEMS, d/b/a Weck, a division
of Teleflex,

                                        Defendant - Appellee,

        and

TERI BROM, in her official capacity as Human
Resources Manager; LEEANNE ROSS, in her
official capacity as Human Resources Benefits
Specialist,

                                        Defendants.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   Terrence W. Boyle,
District Judge.  (CA-02-936-BO)

Argued: March 16, 2006              Decided:  May 31, 2006

Before MOTZ, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Morris Eli Fischer, Bethesda, Maryland, for Appellant. David Christopher Lindsay, KILPATRICK STOCKTON, L.L.P., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Ari Taragin, SNIDER & FISCHER, L.L.C., Baltimore, Maryland, for Appellant. Randall D. Avram, KILPATRICK STOCKTON, L.L.P., Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Betty Moticka appeals the district court's grant of summary judgment in favor of her former employer, Weck Closure Systems ("Weck"), on her Family and Medical Leave Act ("FMLA") and retaliation claims. For the reasons discussed below, we affirm.

I.

A.

The facts giving rise to Moticka's cause of action under the FMLA are as follows. Moticka began working at Weck's Durham, North Carolina facility on March 7, 1994. In approximately June 2000, Moticka's podiatrist, Dr. Patrick Dougherty, diagnosed her with bunions and hammertoe in both feet, for which he recommended surgery. On approximately July 7, 2000, Moticka received a note from Dr. Dougherty stating that she would need to be excused from work from July 19, 2000, until September 22, 2000, to recover from surgery. She submitted that note to her employer on July 17, 2000. This was Weck's first notice of Moticka's need for medical leave.

At that time, Weck provided its employees with at least two types of medical leave. First, Weck's short-term disability policy entitled employees to twenty-six weeks of paid leave. J.A. 240, 302. Second, under Weck's FMLA policy, which was posted in a hallway leading to Weck's cafeteria, employees who had worked for Weck for at least one year and who had worked a minimum of 1,250

hours during the preceding year, were eligible for up to twelve weeks of family medical leave during each twelve-month period. Id. at 97. Pursuant to company policy, employees were required to give thirty days' written notice of their desire to take FMLA leave when that leave was foreseeable. Id. at 98.

Weck did not dispute Moticka's eligibility for FMLA coverage, but expressed displeasure at her failure to provide advanced notice of her need for leave. In an internal note regarding Moticka's medical leave, the Human Resources manager stated that "[a]lthough the company is concerned that Betty did not provide notice for her medical leave, Weck Closure Systems will provide Betty with Short-Term-Disability and FMLA, and will provide any reasonable accommodations needed for her return to work." J.A. 187.

Moticka underwent surgery on her left foot on July 19, 2000. Unfortunately, her recovery did not proceed as expected. On September 14, 2000, Dr. Dougherty submitted a note to Weck stating in its entirety that: "Due to recovery from foot surgery, Betty will be unable to return to work until further notice." J.A. 215. Again, on December 9, 2000, Dr. Dougherty submitted a note to Human Resources stating that Moticka's recovery would continue for another six months. Id. at 216.

On January 26, 2001, more than twenty-seven weeks after her leave first began, Moticka had surgery on her right foot. After consulting with its insurance company, Weck concluded that Moticka

should be able to return to work within forty-two days of her second surgery, i.e., by March 12, 2001. J.A. 302. Therefore, on March 5, 2001, Weck informed Moticka that she was expected to return to work on March 12, 2001, unless she provided a doctor's note explaining her need for more leave. Id. at 201, 302. Initially, Dr. Dougherty and Moticka's orthopedic surgeon informed Weck that Moticka would need additional recovery time. Id. at 297, 299. Thereafter, without obtaining Moticka's consent, Weck contacted both physicians and assured them that Moticka's work restrictions could be accommodated. Id. at 223. Based on Weck's representations, both physicians released Moticka to return to work, provided she could remain seated, change positions as needed, elevate her right foot, and wear sneakers or surgical shoes. Id. at 296, 298.

Moticka and Weck exchanged several e-mails between March 7 and March 9, 2001. In those messages, Moticka stated that she knew that Weck had contacted her physicians without her permission, and that those contacts prompted her physicians to write notes releasing her to work with restrictions. J.A. 233. She also informed Weck that she could not drive (because of her healing process) and had not been able to secure any transportation to the Weck facilities, located forty-five miles from her home. Id. Despite Moticka's protestations, Weck reaffirmed its expectation that Moticka report to work on March 12, 2001, and alerted her that

5

if she failed to return to work, she would be considered to have abandoned her position.  Id. at 222.

In total, Moticka was allowed to remain out on leave for thirty-four weeks, from July 17, 2000, until March 12, 2001.  J.A. 38.  Weck paid Moticka's short-term disability benefits for over thirty weeks, from July 17, 2000, until February 15, 2001, four weeks more than required under its short-term disability policy. Id. at 39.  Weck permitted Moticka to remain on unpaid leave during the remaining four weeks of her leave.  Id. at 176.

When Moticka did not report to work on March 12, 2001, Weck's Human Resources manager notified her by e-mail and letter of March 13 and 14, respectively, that she had been terminated for job abandonment.  The March 13 e-mail stated that "we held your job open for six months longer than required by the Family and Medical Leave Act."  J.A. 294.  According to Moticka, "[t]his was the first time Plaintiff was aware she had been on FMLA."  Id. at 26.


## B.

In her second claim, Moticka contends that between 1999 and 2001, Weck took action against her in retaliation for her September 1999 complaint of age discrimination.  In an e-mail message dated September 2, 1999, Moticka, then fifty-two years of age, accused her supervisor, Brian Young, of age discrimination.  Moticka drafted the message in response to Young's requests that she design

6

a training program for a subordinate employee, who was having performance problems. Feeling as though Young had deprived her of the opportunity to craft her own training program and that the subordinate employee should be terminated rather than trained, Moticka resisted Young's instructions. See J.A. 71. She stated, "I do not feel competent to design a program that has a professional advancement/training component." Id. at 103. Further, in closing her message, she launched the following accusation: "You seem to be willing and able to expend energy and find money to train and develop younger people. Are you withholding advancement opportunities from me because I am over 40? Weck advertises itself as an equal opportunity employer. I'd like to see that equality practiced in this department." Id. at 103.

After her complaint, Moticka alleges that she was subjected to a series of adverse employment actions: (1) she received a written warning for insubordination on September 9, 1999; (2) that same day, her supervisors requested that she work no more than 45 hours per week; (3) she was demoted from Document Control Center Supervisor to Document Control Center Coordinator in February 2000; (4) she was not selected for the position of Executive Administrative Assistant to the President in April 2000; (5) she was asked to stop asking questions in quarterly meetings in July 2000; and (6) she was terminated in March 2001.

Moticka filed a charge of discrimination with the EEOC on September 3, 2001. She filed her second amended complaint, alleging age discrimination, violations of the FMLA, hostile work environment, and retaliation, in the Eastern District of North Carolina, on March 10, 2004. Thereafter, Weck and Moticka both moved for summary judgment. The district court granted Weck's motion for summary judgment and denied Moticka's cross-motion on February 1, 2005. Moticka now appeals the district court's disposition of her FMLA and retaliation claims.

## II.

This Court reviews a district court's grant of summary judgment de novo, viewing all facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment may only be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A.

Under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., an eligible employee suffering from a serious health condition is entitled to twelve workweeks of leave during any twelve-month period.  Id. § 2612(a)(1).  Such leave may be paid or unpaid, id. § 2612(c), and may be taken intermittently or on a reduced leave schedule when medically necessary, id. § 2612(b)(1).[1]  An employee is deemed "eligible" for FMLA leave, where she has worked for the employer for at least twelve months and for at least 1,250 hours of the year immediately preceding the requested leave.  Id. § 2611(2)(A).  The determination of whether an employee has been employed for at least twelve months and has worked the requisite hours is made as of the date that leave commences.  29 C.F.R. § 825.11.  While an employee is out on FMLA leave, the employer shall maintain the employee's coverage under any group health plan.  29 U.S.C. § 2614(c)(1).  When the employee returns from leave, she must be restored to her previous position or to one that is equivalent.  Id. § 2614(a)(1).  Under the FMLA, it is unlawful "for any employer to interfere with, restrain, or deny the

---

[1]The FMLA encourages employers to establish more generous leave policies.  See Ragsdale v. Wolverine World Wide, 535 U.S. 81, 87 (2002).  Many employers do so by providing their employees with more leave than legally required, others offer paid medical leave.  Id.  "As long as these policies meet the Act's minimum requirements, leave taken may be counted toward the 12 weeks guaranteed by the FMLA."  Id.

exercise of or the attempt to exercise," any of the aforementioned rights. Id. § 2615. The FMLA sets forth the penalties for a violation of those rights. See id. § 2617.[2]

Before liability will be imposed on an employer for violating an employee's rights under the FMLA, the employee must show that she was prejudiced by the violation. Ragsdale, 535 U.S. at 89. In Ragsdale, the Supreme Court considered 29 C.F.R. § 825.700(a), the federal regulation setting forth the penalty for an employer's failure to notify an employee that it has designated a period of leave as FMLA leave. That regulation provides that "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." 29 C.F.R. § 825.700(a); see also id. § 825.208(a) ("In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as

_____

[2]The FMLA and its accompanying regulations also impose notice requirements on employees and employers. For example, where an employee's need for leave on account of serious illness is foreseeable because of a planned medical treatment, her employer is typically entitled to 30 days' notice. 29 U.S.C. § 2612(e)(2). Additionally an employer may require an employee to submit a doctor's certification to support the initial leave request, id. § 2613(a), and any requests for extended leave, id. § 2614(c)(3)(A). An employer, in turn, is required to post its FMLA policy in a conspicuous location on the work premises. Id. § 2619. Moreover, by federal regulation, "it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee . . . ." 29 C.F.R. § 825.208(a).

10

FMLA-qualifying, and to give notice of the designation to the employee as provided in this section.").

The Ragsdale Court invalidated 29 C.F.R. § 825.700(a) to the extent that it required an employer to give an employee an additional twelve weeks of leave whether or not the employee had shown that her lack of notice caused "any real impairment of [her FMLA] rights and resulting prejudice." Ragsdale, 535 U.S. at 90. In doing so, the Court remarked that requiring an employer to grant additional leave even when no prejudice results from a lack of notice "amends the FMLA's most fundamental substantive guarantee--the employee's entitlement to 'a total of 12 workweeks of leave in any 12-month period.'" Id. at 93 (quoting 29 U.S.C. § 2612(a)(1)). Accordingly, under Ragsdale, courts must undertake a "fact-specific inquiry into what steps the employee would have taken had the employer given the required notice." Id. at 91.

After conducting a fact-specific inquiry, the Ragsdale Court concluded that the employee afflicted with Hodgkin's disease was not entitled to twelve additional weeks of FMLA leave due to her employer's failure to comply with the notice requirement, because she had not shown that she was prejudiced by the violation:

> Ragsdale ha[d] not shown that she would have taken less leave or intermittent leave if she had received the required notice. . . . In fact, her physician did not clear her to work until December, long after her 30-week leave period had ended. Even if Wolverine had complied with the notice regulations, Ragsdale still would have taken the entire 30-week absence.

11

535 U.S. at 90.

B.

With this framework in mind, we examine whether the district court's grant of summary judgment on Moticka's FMLA claim was proper.  Moticka effectively advances three arguments as to why summary judgment was inappropriate: (1) she was not afforded her full entitlement to FMLA leave; (2) even assuming she was granted twelve weeks of FMLA leave, Weck's failure to follow the notice requirements prejudiced her and entitled her to additional FMLA leave; and (3) Weck violated her FMLA rights by engaging in unauthorized communications with her physicians.  For the reasons discussed below, all of these arguments fail.

1.

We begin by considering Moticka's contention that she was not provided all the leave to which she was entitled under the FMLA.  Although there is some dispute as to whether, under Weck's policy, FMLA and short-term disability leave run concurrently or consecutively, we need not resolve this question.  Under either interpretation, summary judgment was appropriate.[3]

_____

[3]Moreover, Weck's FMLA policy would provide little assistance were we to make this determination.  Weck argues that the following language from its FMLA policy should place employees on notice of the fact that their FMLA and short-term disability leave run concurrently:

Accumulated paid vacation and other paid time off to

12

If we adopt Weck's interpretation that FMLA and short-term disability leave run concurrently, Moticka received all the leave to which she was entitled.  Under this interpretation, Moticka's FMLA leave, like her short-term disability leave, began in July 2000, days before her first surgery.  At that time, Moticka was eligible for FMLA leave, because she had worked for Weck for at least twelve months and for at least 1,250 hours during the preceding year.  See 29 U.S.C. § 2611(2)(A).  Nonetheless, her FMLA rights were not infringed, because she was allowed to stay out of work for thirty-four weeks, from July 2000 until March 2001, far more than the twelve weeks of leave required under the FMLA.

---

include paid personal days and paid disability leave must be used first before any unpaid family and/or medical leave will be granted.  Total paid and unpaid leave for family and medical purposes will not exceed twelve (12) weeks during a twelve-month period.

J.A. 97.  We are not persuaded.  The FMLA policy is far from a model of clarity.  Only after a painstaking review of the policy were we able to discern that, under Weck's policy, the first twelve weeks of Moticka's leave counted toward her FMLA entitlement, and that Moticka was paid during that time because she was eligible for at least twelve weeks of short-term disability leave. Accordingly, the first twelve weeks of Moticka's leave qualified as both FMLA and short-term disability leave; during that time, she received the protections of the FMLA and the compensation to which she was entitled under the short-term disability policy.  Although we arrived at this understanding over the course of oral argument, an employee should not be expected to reach these conclusions aided only by the FMLA policy's opaque wording.

13

Nor is Moticka aided by proceeding under her preferred reading that FMLA leave follows short-term disability leave.[4] As of January 19, 2001, the end of her twenty-six week entitlement to short-term disability leave, Moticka had worked less than 1,052 hours during the preceding year.[5] See J.A. 89. Thus, at that time, Moticka had not worked the 1,250 hours required to be eligible for FMLA leave. For the same reason, she could not have received FMLA benefits on February 15, 2001, when Weck actually discontinued short-term disability payments. Likewise, she would not have been eligible for a period of FMLA leave beginning at the time of her termination in March 2001. Accordingly, under this interpretation, Moticka has failed to show any entitlement to coverage under the FMLA, let alone a violation of the FMLA.

---

[4]We need not address the possibility that Moticka's FMLA leave preceded her short-term disability leave, because Moticka understood that she was being placed on short-term disability leave in July 2000. See J.A. 39. Even if Moticka did not concede this point, however, we can be sure that she was on notice of the fact that she was expending short-term disability leave by virtue of the short-term disability payments that she received for over twenty-six weeks of her leave.

[5]In her answers to interrogatories, Moticka indicated that she had worked only 1,052 hours during the 2000 year. J.A. 89. Although she sought to discount those interrogatory answers at a later date (by stating that she had not recorded overtime hours), she cannot create a genuine issue of fact by contradicting herself. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Because of her medical leave, Moticka did not perform any work for Weck during the 2001 year.

2.

Moticka contends that regardless of whether she was given more leave than is required under the FMLA (which she plainly was), Weck's failure to provide her with individualized notice entitles her to twelve additional weeks of FMLA leave.[6] See Ragsdale, 535 U.S. at 84. Weck concedes that Moticka was not provided any individualized notice that her FMLA leave was being expended during her time off, as required by 29 C.F.R. § 825.208(a). See id. ("In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section"). In fact, her only notice came in the form of the FMLA policy that was posted at the Weck facilities. Without question, this generalized notice via a policy that confuses more than it clarifies, did not suffice. Nonetheless, however, Moticka must show prejudice arising from her lack of notice. See Ragsdale, 535 U.S. at 89. This she cannot do.

Although Moticka argues that she was prejudiced by Weck's failure to tell her that she was expending her FMLA leave, the record shows otherwise. The only evidence Moticka proffers as to prejudice is her doctor's affidavit stating that "[a]lthough

---

[6]In performing this analysis, we do not consider the possibility that FMLA and short-term disability leave run consecutively, because we have already concluded that Moticka would not have qualified for FMLA protection under that interpretation.

15

necessary, Ms. Moticka's operations were not the type of surgery that required immediate attention," and that "[h]ad my or Ms. Moticka's schedule necessitated, either of her two surgeries could have been postponed and rescheduled for a later date." J.A. 315. That stated, however, Moticka does not indicate that she <u>would</u> have delayed her surgeries had she known that her FMLA leave began to run on July 17, 2000.

Moreover, given that when Moticka decided to undergo surgery, she was laboring under the impression that her recovery from both surgeries would take only two months, it is far from clear that she would have delayed her first surgery had she known that her FMLA leave was being expended. Indeed, had Dr. Dougherty's predictions been correct, Moticka's twelve weeks of FMLA leave would have more than covered her anticipated recovery period. Moticka's own testimony suggests that she would not have delayed or altered her treatments unless she had known that her FMLA leave was running <u>and</u> that her recovery would take more than twelve weeks. J.A. 275 ("[H]ad I known that I was on FMLA <u>and that it was going to take longer than the 12 weeks allowed by FMLA</u>, I would have made certain that [Dr. Dougherty] was aware that the treatment needed to be modified rather than allowing him to extend it the way he did because there was no way that I would have risked losing my job with the company for something like this . . . ." (emphasis

16

added)).  Unfortunately for Moticka, however, the very fact that hindsight is better than foresight does not establish prejudice.

Further, the record is bereft of any evidence to suggest that Moticka's recovery from her first surgery could have been expedited had she known she was expending her FMLA leave.  Rather, based on Moticka's and Dr. Dougherty's representations, it appears that Moticka needed the many months she requested to recover from her first surgery.  J.A. 279 ("I fully expected to be released to return to work September 22nd, which was what [Dr. Dougherty] had originally put out, but because of the progress with the healing being much slower than he had anticipated, he stretched out the disability."); see also id. at 305 (letter from Dr. Dougherty stating that "[Moticka] had a slow recovery with this first procedure and developed signs and symptoms of a neuroma to the same foot which needed to be treated in the process.").  In September 2000, Dr. Dougherty informed Weck that Moticka would be "unable to return to work until further notice."  Id. at 215.  That December, Dr. Dougherty told Weck that "Betty will be in continued recovery from foot surgery for the next 6 monthes [sic]."  Id. at 216. Thus, from July through December 2000, Moticka represented to her employer that she was not well enough to return to work.  As of December 2000, Moticka had expended all of her FMLA leave and all but six weeks of her short-term disability leave.  Not until January 26, 2001, when she underwent surgery on her right foot, can

17

we infer that her left foot was sufficiently healed to permit her to return to work. At that time, Moticka had expended her full entitlement to short-term disability and FMLA leave. "Even if [Weck] had complied with the notice regulations, [Moticka] still would have taken" her full twenty-six combined weeks of FMLA and short-term disability leave. Ragsdale, 535 U.S. at 90. Accordingly, Moticka, like the plaintiff in Ragsdale, has failed to show prejudice.[7]

3.

Finally, Moticka's claim that Weck violated her FMLA rights by communicating with her physicians without her prior approval also fails, because she has shown no injury. Although federal regulation prohibits an employer from having conversations with an employee's medical provider absent the employee's prior approval, see 29 C.F.R. § 825.307(a), no relief for such a violation lies unless some FMLA right was interfered with, restrained, or denied. Ragsdale, 535 U.S. at 89 ("[A]n employee must prove, as a threshold

---

[7]At best, Moticka could argue that she would have delayed her second surgery had she known that, as of the date of that procedure, she had expended her full entitlement to FMLA and short-term disability leave. That argument is to no avail, however, because as of January 19, 2001, when her FMLA and short-term disability leave expired, Weck had no legal obligation to hold open her job. Nonetheless, whether by grace or mistake, Weck granted Moticka seven additional weeks of leave (four of them paid). Still, once Moticka was released to return to work and Weck notified her of the consequences of failing to do so, she did not report to work or provide a physician's certification to justify her absence.

matter, that the employer violated § 2615, by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, § 2617 provides relief only if the employee has been prejudiced by the violation."). Moticka's claim fails because she has not shown that the unauthorized communications interfered with her ability to exercise any of her statutory rights under the FMLA. Despite the communications, Moticka received all of the FMLA leave to which she was entitled, see 29 U.S.C. § 2612(a)(1); Weck fulfilled its obligation to maintain her group health insurance, id. § 2614(c)(1); and Weck offered to restore her to an equivalent position at the end of her approved leave, id. § 2614(a)(1).

IV.

We now address Moticka's retaliation claim. The Age Discrimination in Employment Act ("ADEA") makes it an unlawful employment practice to discriminate against an employee "because such individual . . . has opposed any practice made unlawful [under the ADEA], or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d). To establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the

19

adverse action." Laber v. Harvey, 438 F.3d 404, 432 (4th Cir. 2006) (en banc). Once a plaintiff succeeds in making out a prima facie case of retaliation, the defendant must present a legitimate nondiscriminatory reason for the adverse employment action. Id. At that point, the plaintiff bears the burden of showing that the proffered legitimate reason for the adverse action was mere pretext. Id.

Moticka claims that she was retaliated against on account of a September 2, 1999 e-mail that she sent to her supervisor, Brian Young, in which she stated: "You seem to be willing and able to expend energy and find money to train and develop younger people. Are you withholding advancement opportunities from me because I am over 40? Weck advertises itself as an equal opportunity employer." J.A. 103. Moticka claims that Weck took action against her in retaliation for her complaint, with the final act of retaliation occurring in 2001 at the time of her termination. Specifically, on September 9, 1999, she was given a written warning for insubordination; on that same date, she was instructed not to work any more overtime; in February 2000, she was demoted to Document Control Center Coordinator; in April 2000, she was denied the position of Executive Administrative Assistant to the President; in July 2000, she was ordered to stop asking questions at quarterly meetings. Although these episodes may not be considered as

20

separate adverse employment actions because they are time-barred,[8] they can be treated as background evidence in support of her retaliation claim.[9]  AMTRAK v. Morgan, 536 U.S. 101, 113 (2002).

The district court concluded that Moticka could not establish a prima facie case of retaliation, because the lapse of time between her age discrimination complaint and termination severed any causal link between the two events.  J.A. 331.  Moticka, however, contends that the lapse of time is without consequence, because Weck could not have retaliated against her sooner as she was out on medical leave.  Although a significant lapse of time

_____

[8]Because Moticka filed her retaliation claim with the EEOC on September 3, 2001, any episodes of alleged discrimination occurring more than 180 days earlier, i.e., prior to March 8, 2001, are time-barred.  See 29 U.S.C. § 626(d)(2) (providing that a charge of unlawful discrimination shall be filed "within 180 days after the alleged unlawful practice occurred;" or "within 300 days after the alleged unlawful practice occurred" where a plaintiff has commenced state proceedings under a state law prohibiting age discrimination).  Moticka is subject to the 180-day time limit, not the more generous 300-day limit, because she did not opt to file her claim with a state agency before proceeding to the EEOC.

[9]In this instance, however, the background evidence is not particularly compelling, because Weck provides plausible nonretaliatory explanations for most of the events.  Weck explains that Moticka was given a written warning and was subsequently demoted because she resisted her supervisor's repeated requests that she complete a performance plan for an employee under her supervision and displayed a lack of confidence in her supervisory abilities.  Weck states that Moticka was asked to limit her work hours based on her supervisor's conclusion that her job could be performed during a forty-hour workweek, and that Moticka's discontent with her job might have stemmed from working excessive hours.  According to Weck, Moticka was not selected as Executive Administrative Assistant to the President because the 52-year-old person who had been acting in that capacity was more familiar with the job requirements.

between a protected activity and an adverse employment action can negate any inference of causal connection, <u>Dowe v. Total Action Against Poverty</u>, 145 F.3d 653, 657 (4th Cir. 1998), where there is a reasonable explanation for the lapse of time, a causal connection may still be inferred.  For example, in <u>King v. Rumsfeld</u>, 328 F.3d 145 (4th Cir. 2003), this Court found that a two-month lapse between the protected activity and the alleged retaliation was not excessive, because the employer had indicated its intent not to terminate the school employee before the end of the academic year. <u>Id.</u> at 151 n.5.  For several reasons, however, Moticka cannot benefit from the principle announced in <u>Rumsfeld</u>.

Here, the inference of retaliatory motive is undercut, not only by the length of time between the protected activity and adverse action (nearly two years), but also by the favorable treatment Moticka received from July 2000 until her termination. First, because Moticka had not complied with the FMLA's notice requirement in requesting her leave, Weck could have denied her leave when it was initially requested, but it did not do so.  Next, Weck gave her more paid leave than was required under its short-term disability policy (payments ended on February 15, 2001, rather than on January 19, 2001).  Finally, by allowing Moticka thirty-four weeks of leave, Weck gave Moticka more leave than required under its FMLA and short-term disability policies.  These facts are not consistent with an intent to retaliate against Moticka.

22

Because Moticka has failed to make out a prima facie case of retaliation, the district court properly granted Weck's motion for summary judgment on Moticka's retaliation claim.

## V.

For the reasons set forth above, we affirm the district court's grant of summary judgment in favor of Weck.

<u>AFFIRMED</u>

23