**Alvin PULLEY, Plaintiff**

v.

**KPMG CONSULTING, INC., A/K/A Bearingpoint, Inc., Defendant.**

**No. RWT 03–CV–1898.**

United States District Court,
D. Maryland.

Dec. 22, 2004.

§ 1981 when Pulley's supervisor gave him a poor work evaluation, placed him in a Performance Improvement Plan ("PIP") and eventually terminated his employment. After the parties had completed discovery, KPMG filed a motion for summary judgment on June 15, 2004 to which Pulley filed a timely memorandum in opposition on July 26, 2004. Pulley attached an affidavit to his opposition in which he recounts certain facts related to his case. On August 16, 2004, KPMG filed a motion to strike portions of Pulley's affidavit. The Court heard argument of counsel on KPMG's motion for summary judgment on August 23, 2004. After the hearing, on September 9, 2004, Pulley filed a timely opposition to the KPMG's motion to strike.[1]

Diane Allison Seltzer, The Seltzer Law Firm, Michael Gerard Kane, Cashdan Kane and Seltzer, Washington, DC, for Plaintiff.

Stephen W. Robinson, McGuireWoods LLP, McLean, VA, Elena D. Marcuss, McGuireWoods LLP, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

TITUS, District Judge.

■ On June 27, 2003, Alvin Pulley ("Pulley") filed a two count complaint alleging that his former employer, KPMG Consulting, Inc. ("KPMG"), had engaged in racial discrimination (Count I) and retaliation (Count II) in violation of 42 U.S.C.

### Factual Background

In July 1999, KPMG hired Pulley as a Consultant. From July 1999 through July 2000, Pulley worked under the supervision of Barbara Morris–Welsh ("Welsh"). In June 2000, Welsh gave Pulley an overall score of "Meets Expectations" or "ME" on his year end evaluation. In July 2000, Pulley began reporting to a new supervisor, Mark Bowerman ("Bowerman"). It is undisputed that Bowerman and Pulley did not have what would be considered a good working relationship. Pulley admittedly disagreed with many of Bowerman's decisions and had little respect for him. Despite these disagreements, Bowerman gave Pulley an overall rating of "ME" in July 2001 on his second annual performance

---

**1.** In its Motion To Strike Portions of the Affidavit of Alvin Pulley, KPMG argues that (1) the affidavit was not signed or dated and (2) certain paragraphs of Pulley's affidavit are hearsay or otherwise inadmissible under Federal Rule of Civil Procedure 56. First, the Court notes that the affidavit filed with the Court was signed and dated, but apparently an unsigned copy was served on counsel for KPMG. Second, the Court will only consider those parts of the affidavit that are based on the personal knowledge of the Plaintiff and constitute admissible evidence. To the extent KPMG objects to Pulley's affidavit because it includes his own opinion as to his work performance, the Court does not find these statements credible in accordance with *King v. Rumsfeld,* 328 F.3d 145 (4th Cir.2003).

evaluation and instructed Pulley to maintain visibility and communications. On November 8, 2001, Bowerman sent to all of his employees an e-mail which provided a framework for work distribution on the Intraspect project, a software application on which a team of employees, including Pulley, was working. A few days later, on November 12, 2001, Pulley and another one of Bowerman's employees e-mailed Bowerman alternative suggestions to the workload distribution, but Bowerman indicated by e-mail that the distribution would remain as he had initially devised it. On November 13, 2001, Pulley sent a patronizing and sarcastic e-mail to Bowerman, saying "I hope you can make the same commitment that we have to ensure that this project is successful and is truly a team effort." Bowerman considered this e-mail to be insubordinate and Pulley himself admitted that he could understand that Bowerman may have perceived his behavior as inappropriate. As a result of the e-mail, Bowerman conducted a counseling session with Pulley to explain that his e-mail comment was sarcastic and that he hoped a similar incident would not be repeated.

In January 2002, Bowerman conducted Pulley's Interim Review on which Pulley received a score of "ME." Despite this acceptable score, Bowerman informed Pulley of some problems with his performance. Bowerman reiterated to Pulley that he needed to work on his communication with the team and noted that he would like to see Pulley focus on achievement and take advantage of his project team.

On June 25, 2002, Pulley received an overall score of "Meets Some Expectations" ("MS") on his Fiscal Year 2002 Year End Review. In that review, Bowerman indicated that Pulley had not made sufficient progress on the issues discussed with him during his Interim Review. On June 25, 2002, approximately one week after receiving a score of "MS" on his annual evaluation, Pulley e-mailed Bowerman and told him that Pulley believed there was "noticeable bias in this review and the direction of the entire project." Bowerman did not immediately respond to this e-mail. Instead, Bowerman prepared a draft of an e-mail response to Pulley, but only sent it to Ed Courtney ("Courtney"), Chief Knowledge Officer and Managing Director. After reviewing Bowerman's draft response, Courtney advised Denise Wallace ("Wallace"), Manager of Knowledge Operations, that Pulley had received a score of "MS" on his evaluation and that he should be placed on a PIP, with the ultimate goal of his continued employment.

In July 2002, Wallace asked Pulley to give her the decision tree matrix on which he was working. The decision tree matrix was originally due on April 30, 2002, but Pulley had not yet completed the project. Pulley e-mailed Wallace an incomplete decision tree matrix and Wallace attempted to schedule a meeting with Pulley on July 11, 2002 to discuss both the matrix and Pulley's PIP placement. However, Pulley was leaving for a ten day vacation on July 12 and was not planning on being in the office on July 11. Instead, he told Wallace that he was having his car repaired and offered to have a discussion by cellphone.

On July 22, 2002, when Pulley returned to work from his vacation, he e-mailed Courtney and Allison Philhower (Philhower), KPMG's Human Resources Director, to ask "what is the process for filing a formal bias complaint against [Bowerman]?" Also on July 22, Wallace left Pulley a voicemail message at work to reschedule the July 11 meeting. Pulley, however, refused to attend the meeting in light of the problems he claimed he was having with Bowerman and Philhower. Wallace advised Pulley to contact Philhower. Pulley contacted Philhower and

the PIP meeting was postponed. On the same day, Bowerman forwarded to Philhower the draft e-mail he had prepared in response to Pulley's June 25, 2002 e-mail, and which he had previously shared with Courtney. Philhower approved the draft e-mail and told Bowerman to include a phrase that read, "Alvin, I prepared this response to your e-mail, but recognize I did not send it to you as timely as I should have. Please review my comments. I'd be happy to discuss any aspect with you in person." After adding that sentence to the e-mail, Bowerman sent Pulley his response.

On July 23, 2002 Pulley responded to Bowerman's e-mail by sending a reply to Bowerman, Courtney, Philhower and Wallace in which he indicated that he "will move forward in lodging a formal bias complaint against [Bowerman] with Human Resources" and that he believed he was being denied his Equal Employment Opportunity Rights. Later that afternoon, Pulley met with Claudia Boykin ("Boykin") in the Human Resources Department to discuss his claim of discrimination.

Wallace decided to schedule a meeting on July 24, 2002 to finalize the decision tree matrix. Prior to the meeting, Philhower instructed Wallace to remind Pulley that the decision tree matrix was overdue. Wallace suggested that she remind him of the decision tree matrix in person at the afternoon's scheduled meeting, but Philhower insisted that the reprimand be e-mailed to Pulley. Therefore, on July 24, 2002, and prior to the scheduled meeting concerning the decision tree matrix, Wallace e-mailed Pulley to tell him that the decision tree matrix was overdue; he must work harder to complete his projects in a timely fashion; and that he should call her when he would not be able to meet a deadline.

Pulley responded to Wallace's e-mail with another sarcastic e-mail that read "[y]esterday you e-mailed me saying you'd have feedback in the afternoon. Should I expect you to call me when you do not meet deadlines, particularly those that you set?" Pulley attended the meeting, but he did not participate and remained silent and sullen throughout the meeting. That evening, Courtney called Wallace at home to ask her about the outcome of the meeting. Wallace told him about the e-mail Pulley sent to Wallace and Pulley's behavior at the meeting. On the next day, July 25, 2002, Pulley's employment was terminated for insubordination and poor performance. Pulley's job responsibilities were given to another African–American employee.

### Summary Judgment Standard

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-moving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the district court is required to grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). District Court judges have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses from proceeding to trial.'" *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citations omitted). Thus, the existence of a scintilla of evidence in support of Pulley's position is insufficient to defeat KPMG's motion for summary judgment; instead, Pulley must present evidence on which the jury could reasonably find in his favor. *Anderson* at 250, 106 S.Ct. 2505.

*Defendant's Motion For Summary Judgement*

## I. McDonnell Douglas Burden Shifting Standard

 In a case for race discrimination or retaliation under Title VII or Section 1981, the plaintiff at all times has the burden of proving intentional discriminatory treatment through direct or indirect evidence. *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Pulley here admits that he has no direct evidence of discrimination; therefore, he must proceed under the familiar burden shifting standard set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to prevail on Defendant's Motion For Summary Judgment, Pulley bears the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 133 (4th Cir.2002). If Pulley can establish a prima facie case of discrimination, then the burden of production shifts to KPMG to provide a legitimate, nondiscriminatory reason for the differential treatment. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If KPMG can provide that reason, Pulley must then prove by a preponderance of the evidence that the legitimate reason offered by KPMG was not its true reason, but was a pretext for discrimination. *See Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.

## II. Count I—Race Discrimination

 Pulley claims that KPMG discriminated against him on the basis of his race when (1) he was given a score of MS on his FY02 evaluation; (2) he was placed in a Performance Improvement Plan ("PIP"); and (3) his employment was terminated. Pulley has not met his burden of producing evidence on which a reasonable jury could conclude that he has established a prima facie case; and therefore, judgment must be entered in favor of KPMG on Pulley's claim for racial discrimination. In order to make out a prima facie case of discrimination based on Pulley's FY02 score of MS or KPMG's placing him in a PIP, Pulley must prove that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time KPMG took the adverse employment action, Pulley was performing at a level that met KPMG's legitimate expectations; and (4) that he was treated differently from other similarly situated persons who are not members of Pulley's protected class. *Byrd v. The Baltimore Sun Co.,* 279 F.Supp.2d 662 (D.Md.2003); *King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir. 2003).. In order to make out a prima facie case for discrimination on the basis of the termination of his employment, the factors Pulley must prove are the same, except that the final factor requires that Pulley's position was filled by a similarly qualified applicant outside of his protected class. *Id.*

Pulley is African–American and is thus a member a of a protected class. However, Pulley is unable to satisfy the remaining factors of a prima facie case.

*Adverse Employment Action*

 Neither the poor evaluation rating, nor the placement on a PIP constitute adverse employment actions.[2] In defining what constitutes an adverse employment

---

**2.** The fact that Pulley's employment was terminated, however, is clearly an adverse employment action.

action, the Court looks to whether discrimination existed in an "ultimate employment decision[ ] such as hiring, granting leave, discharging, promoting and compensating." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981). A performance review which has no effect on Plaintiff's compensation or promotion cannot be considered an adverse employment action.[3] Similarly, placement in a PIP "simply does not amount to a redressable adverse employment action." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 329 (D.Md.2003). In Pulley's case, the decision to place him on a PIP did not adversely alter the conditions of his employment, because it was designed to permit Pulley to continue his employment. In fact, Pulley never began his performance improvement program, in part because he refused to attend the meetings organized to implement it.

*Pulley's Performance Level*

▬▬▬ Pulley cannot make out a prima facie case for discrimination because he has not presented evidence on which a reasonable jury could conclude that he was performing at a level that met KPMG's legitimate expectations. On his interim evaluation, Bowerman specifically listed areas in which Pulley's performance needed improvement, such as his communication skills and the ability to effectively use his project team. Pulley failed to improve in these areas. Pulley had difficulty completing his work—he was responsible for 18 projects, only three of which were completed. Moreover, Pulley was rude and sarcastic to his supervisors and refused to modify his schedule to accommodate workplace needs. The record is replete with circumstances in which Pulley e-mailed snide and sarcastic messages to his superiors, refused to attend meetings and behaved unprofessionally when his work performance was criticized. Only his own affidavit and his own deposition testimony imply that he was performing at an acceptable level. However, an employee's own testimony "cannot establish a genuine issue as to whether [he] was meeting [his employer's] expectations." *King*, 328 F.3d at 149. "[I]t is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996)). In order to establish that he was meeting KPMG's expectations, Pulley must have presented qualified expert testimony of KPMG's legitimate business expectations and an analysis of Pulley's performance in light of those expectations, which he failed to do. *King*, 328 F.3d at 150. Based on this record, the finder of fact could not conclude that Pulley was performing at an acceptable level that met KPMG's legitimate expectations.

*Treatment of Other Similarly Situated Employees*

▬▬▬ Pulley cannot identify any employees outside of his protected class who received a score of MS on their evaluations or behaved insubordinately, but were not placed in a PIP or terminated. Pulley has also failed to prove that his position was filled by a similarly qualified applicant *outside* of his protected class. In fact, Pulley's work duties were assumed by an African–American employee.

---

**3.** Pulley's affidavit claims that his evaluation score of "MS" made him ineligible to receive an annual salary increase or bonus. However, Pulley offers no evidence, other than his affidavit to support this allegation. The Court notes that, even if Pulley's allegation were true, he could not set forth a prima facie case because (1) he cannot show that he was performing at an acceptable level and (2) he has not identified any similarly situated persons outside of his protected class who were treated differently.

### III. *Count II—Retaliation*

■ To establish a prima facie case of retaliation, Pulley's evidence must demonstrate that: (1) he engaged in protected activity; (2) KPMG took adverse employment action against him; and (3) there is a causal connection between the protected activity engaged in by Pulley and the subsequent action taken by KPMG. *Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 242 (4th Cir.1997).[4]

■ Pulley's actions on July 22, 2002 in informing his employer that he intended to file an EEO complaint and meeting the next day with Boykin in Human Resources in order to file that complaint constitute protected activity. Under 42 U.S.C. § 2000e–3 (2003), it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter [opposition clause], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [participation clause]." To determine whether an employee has engaged in opposition activity, the Courts balance Title VII's purpose in protecting persons who engage in activities to oppose discrimination with an employer's ability to control its personnel. *Glover v. South Carolina Law Enforcement Div.,* 170 F.3d 411, 413 (quoting *Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 259 (4th Cir.1998)). However, "[o]pposition activity encompasses utilizing formal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 259 (4th Cir.1998). Complaining to an employer and/or participating in the employer's informal grievance procedure are acceptable opposition activities when done in a manner that "is not disruptive or disorderly." *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981) (female employee's consistent complaints were not disruptive when all of her complaints were related to her perceived disparate treatment). Therefore, it was not necessary for Pulley to file a formal complaint for his actions to be protected, because his discussion with Human Resources is well within the boundaries of reasonable opposition activity. Moreover, insofar as Pulley followed the required internal procedures for filing a complaint, it could reasonably be inferred that he was "making a charge," which falls squarely within accepted participation activities, which "are vigorously protected to ensure employees' continuing access to the EEOC and the enforcement process." *Laughlin,* 149 F.3d at 259.

Only three days later, subsequent to Pulley's complaint, KPMG took the adverse employment action of terminating his employment. The Fourth Circuit has held that "a causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employ-

---

4. In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that 42 U.S.C. § 1981 covered discrimination only in the formation of contracts, not the performance of them. In response to the Court's ruling in *Patterson,* Congress amended § 1981 through passage of the Civil Rights Act of 1991 to include Subsection (c) which makes § 1981 applicable "to all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 302, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Thus, the full range of remedies available in the employment context through Title VII is also available under § 1981. Furthermore, the required elements of both claims are the same. *Bryant,* 288 F.3d at 133 n. 7.

ment action against an employee shortly after learning of the protected activity." *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir.2004). KPMG concedes that the fact that Pulley's termination so closely followed his request for information on how to file an EEOC complaint satisfies Pulley's burden of setting forth the causality element of a prima facie case, but correctly points out that this temporal proximity does not establish a claim of retaliation. *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989) (holding that a mere three and one half months span of time between protected activity and discharge establishes a prima facie case of causality, but "far from conclusively establishes the requisite causal connection" to ultimately prove retaliatory discharge); *King,* 328 F.3d at 150–51. Instead, under the next step in the *McDonnell Douglas* burden shifting analysis, KPMG has the opportunity to set forth a legitimate, non-discriminatory reason for terminating Pulley's employment, and unless Pulley can produce evidence to establish that this reason is a pretext for discrimination, summary judgment must be entered in favor of KPMG. *Id.*

 KPMG has indeed set forth legitimate non-discriminatory reasons for its termination of Pulley's employment, including but not limited to that facts that Pulley failed to complete his projects in a timely manner, was behaving insubordinately and was sending sarcastic e-mails to his supervisors. KPMG tried to enroll Pulley in a Performance Improvement Plan in order to salvage his employment, but Pulley refused to begin the Plan. Pulley does not present any evidence that KPMG's reasons for terminating his employment were pretextual except for the temporal proximity of the termination to Pulley's complaint.

 Pulley's opposition to a practice that he believed to be a violation of his civil rights does not immunize his behavior. *Glover,* 170 F.3d at 414 (1999). "[A]n EEOC complaint creates no right on the part of an employee to miss work, fail to perform assigned work, or leave work without notice." *Id.* (citations omitted). The sword of an EEOC complaint cannot be used as a shield to protect an employee from the consequences of inappropriate behavior that is incontrovertibly below the reasonable expectations of his employer. This is especially the case, where as here, the conduct in question was of the same inappropriate nature both before and after the protected activity. Pulley's complaint may have been protected legally, but he was not at liberty to misbehave as a result. Pulley had no right to refuse to attend meetings designed to begin his involvement in a PIP, nor did it give him the right to behave inappropriately at the meeting scheduled to discuss the overdue decision tree matrix. Furthermore, since "[t]he court does not sit as a 'super-personnel department'," it will not determine whether an employer made the right decision, only whether, based on the perception of the employer, Pulley was performing at an acceptable level. *Mugro v. Giant Food, Inc.,* 187 F.Supp.2d 518, 522 (D.Md. 2002). Without any evidence to suggest that KPMG's reasons for terminating Pulley's employment were pretextual, Pulley has not met his burden and judgment will be entered in favor of KPMG on Pulley's claim for retaliation.

A separate Order follows.

### ORDER

Upon consideration of Defendant's Motion For Summary Judgment and the opposition thereto, Defendant's Motion To Strike Portions of the Affidavit of Alvin Pulley and the opposition thereto and the

argument of counsel heard on August 23, 2004, it is this 22 day of December, 2004, by the United States District Court for the District of Maryland,

ORDERED, that Defendant's Motion To Strike Portions of the Affidavit of Alvin Pulley (Paper No. 42) is DENIED, and it is further

ORDERED, that Defendant's Motion For Summary Judgment (Paper no. 25) is GRANTED, and it is further

ORDERED, that judgment for costs is entered in favor of Defendant; and it is further

ORDERED, that the Clerk is directed to CLOSE this case.