**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 05-1118**

_____

ALVIN PULLEY,

Plaintiff - Appellant,

versus

KPMG     CONSULTING,     INCORPORATED,     a/k/a
Bearingpoint, Incorporated,

Defendant - Appellee.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (CA-03-
1898-RWT)

_____

Argued:  December 2, 2005            Decided:  June 2, 2006

_____

Before WILKINS, Chief Judge, LUTTIG,[1] Circuit Judge, and Walter D.
KELLEY, Jr., United States District Judge for the Eastern District
of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Michael Gerard Kane, CASHDAN & KANE, P.L.L.C., Washington,
D.C., for Appellant.  Stephen W. Robinson, MCGUIREWOODS, L.L.P.,
McLean, Virginia, for Appellee.  **ON BRIEF:** Meredith S. Francis,
CASHDAN & KANE, P.L.L.C., Washington, D.C., for Appellant.

_____

[1]Judge Luttig heard oral argument in this case but resigned
from the court prior to the time the decision was filed.  The
decision is filed by a quorum of the panel pursuant to 28 U.S.C.
§ 46(d).

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Alvin Pulley appeals the district court's order granting summary judgment to his employer, KPMG Consulting, Inc., a/k/a Bearingpoint, Inc. ("KPMG"), on Pulley's claims that KPMG racially discriminated and retaliated against him in violation of 42 U.S.C. § 1981. Finding no error, we affirm.

I.

Pulley, an African-American male, began his employment with KPMG in July 1999. KPMG, which is based in McLean, Virginia, provides information technology and management consulting services to various companies and government organizations worldwide. KPMG originally employed Pulley in its McLean office as a consultant in its Global Consulting Solution Center. Although he was assigned to the McLean office, Pulley worked a majority of the time from home on his personal computer.

In his Year End Review for the 2000 fiscal year, Pulley received an overall score of "Meets Expectations." This score was the third highest (or, depending on one's perspective, the third lowest) out of five possible overall scores.[2]

---

[2]The five possible overall scores, ranked highest to lowest, were: Significantly Exceeds Expectations, Exceeds Expectations, Meets Expectations, Meets Some Expectations, and Does Not Meet Expectations.

In July 2000, Pulley was transferred to KPMG's Business Development and Knowledge Center ("BDKC"). Pulley was the only African-American employee out of approximately 55 employees working in the BDKC. Pulley was assigned to work with a team of other employees on a "knowledge sharing and intellectual capital capture" software application known as the "Intraspect project."

Pulley's supervisor in the BDKC was Performance Manager Mark Bowerman, a Caucasian male. Pulley and Bowerman did not have a good working relationship, and Pulley openly disagreed with many of Bowerman's management decisions.

While Pulley claimed to respect Bowerman's position as a manager, he admits not having "a great deal of respect" for Bowerman personally. Pulley perceived that Bowerman was "uncommunicative" with him, "standoffish," "somewhat hostile" in demeanor, and "arrogant in refusing to discuss issues." Although Pulley believed that Bowerman was "very uncomfortable" meeting with him on a "one-on-one" basis because he is African-American, he did not have any facts to support that belief.

Despite the lack of a good working relationship between them, Bowerman gave Pulley an overall score of "Meets Expectations" on his Year End Review for the 2001 fiscal year. In the review, Bowerman suggested that Pulley "work on maintaining visibility and communications" and "expand his profile" on the Intraspect project

4

team.  Bowerman concluded that he was "very hopeful that [Pulley] will elevate his profile and prove his case for a promotion."

In November 2001, Bowerman sent to all the employees on the Intraspect project team, including Pulley, an email establishing a framework for work distribution on the project.  Bowerman's goals included, among other things, a more even distribution of the workload and an increase in the overall efficiency and employee participation of the entire team.  Bowerman invited the individual team members to respond to his proposed framework.  Pulley and Patricia A. Seaton, who was assigned to work on the Instraspect project team with Pulley, accepted Bowerman's invitation.  They authored a joint email outlining their perspective on their roles within the project team.

In response, Bowerman informed Pulley and Seaton by email that their perspective on his proposed framework was problematic. Bowerman explained that Pulley and Seaton failed to address his proposal, but instead merely created a "parallel framework" that would enable them to "retain control and sole possession of the program," contrary to Bowerman's goal for the project team. Bowerman stated that he had "issued a clear imperative over the last several months, stated very strongly over the last week, that a primary objective" of the project team was to broaden the team and increase efficiency.  Bowerman concluded that he was not satisfied with the project team's progress toward that imperative

and that the response of Pulley and Seaton exemplified "self-destructive behaviors" that did not inspire his confidence.

Pulley responded by email dated November 13, 2001. Pulley criticized Bowerman's proposed framework, stating in relevant part:

> It is truly surprising to me that all the issues that you have mentioned have miraculously become extremely important at this point in the project. . . .

> Going forward, I hope you can make the same commitment that we have to ensure that this project is successful and is truly a team effort.

Not surprisingly, Bowerman perceived the tone of Pulley's email to be disrespectful and sarcastic. Bowerman met with Pulley to discuss the inappropriate nature of his comments.

In January 2002, Bowerman gave Pulley an overall score of "Meets Expectations" on his Interim Review for the 2002 fiscal year. Although Bowerman gave Pulley an acceptable score, he noted that Pulley needed to improve his performance in several areas, including greater communication and interaction with the entire project team and an increased focus on achievement and results. Bowerman met with Pulley to discuss his concerns about Pulley's work performance.

In the June 2002 Year End Review, Bowerman lowered Pulley's evaluation score to "Meets Some Expectations." Bowerman explained that Pulley had failed to improve his focus on results and execution and his communication and collaboration with the project team. Bowerman stated that these areas of needed improvement in

Pulley's work performance had become "glaring issues" over the preceding six months. Bowerman concluded that Pulley failed to demonstrate certain "attributes . . . identified as important to being an effective, contributing member of a small operations team: the ability to churn out work products quickly and effectively and the ability to collaborate with teammates to accomplish a goal efficiently."

Pulley sent Bowerman an email, dated June 25, 2002, in which he questioned, among other things, the score he received in the annual review. In the email, Pulley expressed his desire to have his score changed and stated that he had "deep concerns about the noticeable bias in this review and the direction of the entire project."

The following day, Bowerman prepared a draft email that addressed Pulley's concerns. Bowerman sent the draft to Edward Courtney, KPMG's Chief Knowledge Officer and Managing Director. Courtney advised Bowerman not to respond to Pulley at that time because Courtney believed that Pulley was merely "attempting to just recast his performance under terms that were favorable" to himself. Courtney was concerned, however, that Pulley may have been alleging that he was the victim of racial discrimination.

In July 2002, Bowerman was reassigned to a different position as part of a fiscal year-end reorganization of the BDKC. Denise Wallace became Pulley's new immediate supervisor. Courtney

7

informed Wallace that Pulley had received a "Meets Some Expectations" score on the 2002 Year End Review and that he needed to be placed in a "Performance Improvement Plan" ("PIP"). The PIP was intended to address the shortfalls in Pulley's performance and assist Pulley in achieving a minimum level of performance in those areas. Pulley's continued employment with KPMG was the ultimate goal of the PIP.

On July 10, 2002, Wallace asked Pulley to meet with her the following day to "touch base" prior to his planned ten-day vacation, which was scheduled to begin on July 12, 2002. Wallace did not mention to Pulley her intention to discuss the PIP with him at the proposed meeting. Pulley declined Wallace's request to meet because he planned to work at home the next day so that he could be readily available to pick up his vehicle from a repair shop in Maryland. Pulley suggested that Wallace instead call or email him at his residence. Wallace responded that this was "a good plan" and that she would attempt to call him on his cellular phone the following afternoon. The call did not occur. Courtney, Wallace, and Allison Philhower, KPMG's Human Resources Director, instead decided to wait until Pulley returned from his vacation before discussing his PIP with him.

Prior to leaving for vacation, Pulley failed to turn in to Wallace a completed version of a "Decision Tree Matrix" (the "Matrix") for the Instraspect project. The Matrix was due by the

8

close of business on July 11, 2002.  Its completion had already been postponed by over two months.

After Pulley returned from his ten-day vacation, he emailed Courtney and Philhower on July 22, 2002 to inform them that Bowerman had not yet responded to his questions concerning the 2002 Year End Review.  In the email, Pulley inquired about the "process for filing a formal bias complaint" against Bowerman.

That same day, Wallace contacted Pulley and attempted to schedule a meeting with him to discuss his PIP.  Pulley declined to meet with Wallace about the PIP because he believed that an investigation into his complaint against Bowerman should be completed first.

In addition to attempting to schedule a PIP meeting, Wallace asked Pulley to send her a completed version of the Matrix and reminded him that it was due prior to his vacation.  Pulley complied with Wallace's request.  Wallace informed Pulley that she would provide him with "feedback," which he was to incorporate into the latest version of the Matrix.  However, Wallace never sent Pulley any feedback.  Wallace and Pulley scheduled a meeting for July 24, 2002 to finalize the Matrix.

On July 23, Bowerman finally emailed to Pulley his response to Pulley's questions concerning the 2002 Year End Review.  In the email, Bowerman explained why he gave Pulley an overall score of "Meets Some Expectations."  Bowerman also stated:

> I prepared this response to your e-mail, but recognize that I did not send it to you as promptly as I should have. Please review my comments. I'd be happy to discuss any aspect with you directly.

Pulley responded in an email that accused Bowerman of attempting to single him out for "adverse employment action" and to violate his "Equal Employment Opportunity rights." Pulley advised Bowerman that he was going to lodge "a formal bias complaint" against him and "seek an appropriate remedy."

Pulley sent Courtney, Philhower, and Wallace a copy of his email. After Pulley discussed his complaint against Bowerman with Philhower and Equal Employment Opportunity Officer Claudia Boykin, the PIP meeting was postponed.

Prior to the July 24, 2002 meeting between Wallace and Pulley to finalize the Matrix, Wallace sent Pulley an email reprimanding him for his failure to complete the Matrix in a timely fashion. This reprimand was sent at Philhower's instruction. Wallace's email stated, in relevant part:

> I have reviewed [the Matrix] and look forward to meeting with you . . . to go over suggested edits. Alvin, this was due on July 11. Going forward you must meet all deadlines. If there's a problem meeting a deadline, please call me to discuss prior to the deadline.

Wallace copied Philhower on the email.

A few minutes before the July 24 meeting, Pulley sent Wallace a response email and copied Philhower. Pulley's email stated:

> Yesterday you emailed me saying you'd have feedback in the afternoon. Should I expect you to call me when you do not meet deadlines, particularly those that you set?

10

Philhower replied immediately to Pulley, advising him that the "tone of this message is inappropriate and unprofessional" and that she wanted to discuss it with him after the conclusion of the meeting.

Wallace did not read Pulley's email prior to the July 24 meeting concerning the Matrix. Although Pulley attended the meeting, he did not speak for approximately the first 20 minutes. According to Wallace, Pulley simply remained silent and stared at her. Wallace was "disgusted" with Pulley's behavior, which she considered to be "ridiculous."[3]

Immediately after the July 24 Matrix meeting, Wallace read the email that Pulley had sent in response to her reprimand. Wallace was "appalled" and expressed disbelief that Pulley would respond to her in such a "disrespectful and insubordinate" manner.

Courtney, Wallace, and Philhower held a conference call that afternoon to discuss Pulley's lack of performance and his disrespectful behavior. Upon the conclusion of the discussion, they decided to terminate Pulley's employment.[4] KPMG fired Pulley

---

[3]Pulley disputes Wallace's account of the meeting. In an affidavit, Pulley claims that he "participated fully and professionally" in the meeting and answered all questions that were directed to him. According to Pulley, Wallace did not ask him any questions for the first 15 to 20 minutes of the meeting, and she never suggested to him that she was disturbed by his behavior during the meeting.

[4]Courtney, who was the "final decision maker," conceded in deposition that Pulley's Equal Employment Opportunity complaint

11

the next day for insubordination and poor work performance. Pulley's employment responsibilities were reassigned to another African-American employee.

Pulley subsequently filed this action, alleging that KPMG racially discriminated and retaliated against him in violation of 42 U.S.C. § 1981.  The district court granted summary judgment to KPMG on Pulley's discrimination and retaliation claims.  The court held that Pulley failed to establish a <u>prima</u> <u>facie</u> case for his discrimination claims because, among other reasons, he had not presented evidence from which a reasonable jury could conclude that his work performance met KPMG's legitimate employment expectations. The court further held that Pulley could not prevail on his retaliation claim because he failed to show that KPMG's reasons for terminating his employment were pretextual.

II.

After reviewing the parties' briefs and the applicable law, and having had the benefit of oral argument, we conclude that the district court correctly decided the issues before it.

---

entered into his thinking during the discussion whether to terminate Pulley.  According to Courtney, he inquired of Philhower whether Pulley could be terminated after "the EEO question had been raised."  Philhower responded that they could move forward with Pulley's termination because "enough things" had occurred that they "had clear reasons to terminate him."  (J.A. 216-17, 608).

12

Accordingly, we affirm on the reasoning of the district court. <u>See</u> <u>Pulley v. KPMG Consulting, Inc.</u>, 348 F. Supp. 2d 388 (D. Md. 2004).

<u>AFFIRMED</u>