**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OTHENTEC LIMITED; OTHENTEC LTD;
EC4 TECHNOLOGIES LIMITED,
*Plaintiffs-Appellants,*

v.

JEFFREY PHELAN; MARK W. MARTENS;
EC4 TECHNOLOGIES, INCORPORATED,
*Defendants-Appellees.*

No. 06-2297

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:06-cv-00186-CMH)

Argued: January 31, 2008

Decided: May 12, 2008

Before NIEMEYER and SHEDD, Circuit Judges, and
Patrick Michael DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Duffy wrote the opinion, in
which Judge Niemeyer and Judge Shedd joined.

## COUNSEL

**ARGUED:** Jerry William Boykin, WOMBLE, CARLYLE, SAN-
DRIDGE & RICE, Tysons Corner, Virginia, for Appellants. John F.
Mardula, ROBERTS, MARDULA & WERTHEIM, L.L.C., Reston,

Virginia, for Appellees. **ON BRIEF:** Virginia W. Hoptman, Erin L. Roberts, WOMBLE, CARLYLE, SANDRIDGE & RICE, Tysons Corner, Virginia, for Appellants. Shauna M. Wertheim, ROBERTS, MARDULA & WERTHEIM, L.L.C., Reston, Virginia, for Appellees.

---

**OPINION**

DUFFY, District Judge:

Appellants Othentec Limited, Othentec Ltd., and EC4 Technologies Limited appeal the district court's grant of summary judgment for Appellees Jeffrey Phelan, Mark Martens, and EC4 Technologies, Incorporated. Appellants challenge the district court's grant of summary judgment on the grounds that they had established issues of material fact on their claims under the Virginia Computer Crimes Act and the Virginia Uniform Trade Secrets Act. We find no error in the ruling of the district court, and uphold its entry of summary judgment.

I.

Jerry Nims ("Nims") is an entrepreneur who began researching and working with lenticular optical imaging technology in the 1970s. (J.A. at 723.) Over the course of many years, Nims obtained a number of patents and formed a number of corporations to market this technology. (J.A. at 595.) This technology was of particular use in making identification cards that were difficult to tamper with or counterfeit. One key component of Nims' technological innovations is "the cylinder," which cuts three-dimensional images into plastic. (J.A. at 722-23.)

One of the corporations Nims started was Orasee ("Orasee"), which owned patents on many technologies Nims had developed. In 2003, EC4 Technologies Limited ("EC4 UK") was formed as a wholly-owned subsidiary of Orasee to market Nims' technologies. (J.A. at 691.) On May 7, 2004, Orasee entered into an agreement with EC4 UK which gave EC4 UK the exclusive right to license the technological innovations owned by Orasee. (J.A. at 52.)

In April 2005, Othentec Ltd. ("Othentec UK") was set up as a subsidiary of EC4 UK (90% of Othentec UK was owned by EC4 UK) to market Orasee's technologies, specifically in the area of authentication. (J.A. at 25.) Defendant Jeffrey Phelan ("Phelan"), who is Nims' son-in-law, was picked to run these subsidiary corporations. Phelan was appointed to be Managing Director of both EC4 UK and Othentec UK. (J.A. at 683.)

Othentec UK leadership determined that the company needed to take steps to further distribution of its products in the United States market. Phelan was put in charge of this project. On March 17, 2005, EC4 Technologies, Incorporated ("EC4 USA") was formed by Phelan, and incorporated under Delaware law. *Id.* Phelan became the CEO of this corporation. (Appellants' Br. at 8.) A sublicense agreement was struck between EC4 USA and EC4 UK in April 2005 that provided that EC4 USA could market and distribute Orasee technology in the U.S.[1]

Phelan sought, and obtained, money from investor Lantson Eldred ("Eldred") to further the American distribution efforts. (J.A. at 575.) Eldred was also in contact with Ronald Doeve ("Doeve"), who was counsel and director for Othentec, and a confidant of Nims, regarding his investment (J.A. at 575; 683.) During that summer, Eldred was issued shares of stock in EC4 USA. (J.A. at 684-85.)

In August 2005, Phelan hired Mark W. Martens ("Martens") as the Director of Operations for Othentec UK. (J.A. at 670.)

In November 2005, Othentec Limited ("Othentec USA") was formed as a Virginia corporation, also for the purpose of distributing Orasee technology in the U.S. (J.A. at 684.) Othentec USA was wholly owned by Othentec UK. (J.A. at 24.)

From September 2005 to January 2006, five separate withdrawals,

---

[1]Appellants claim that the deal was actually struck during the summer of 2005, but was fraudulently backdated to April 12, 2005, to predate the licensing agreement between EC4 UK and Othentec UK. (J.A. at 683-84.)

totaling nearly $385,000,[2] were made from an Othentec UK bank account to fund the American venture. All but the final withdrawal were made electronically. (J.A. at 835; 857-58.) All withdrawals were requested by Phelan, and all funds were actually withdrawn and wired to Phelan by Bhisham Dindyal ("Dindyal"), who held the position of secretary with both Othentec UK and EC4 UK, and who was a signatory on the account. (J.A. at 860-67.) For at least some of the withdrawals, Doeve also gave his approval through email. *Id.*

During this time period, Phelan had been at least somewhat successful in marketing the identification card authenticating technology in the United States, as deals were struck with DynCorp and Cross-Match to aid in the manufacturing of identification cards and driver's licenses in foreign nations (J.A. at 780.) These companies entered into contracts with EC4 USA.

By early 2006, a considerable amount of friction had developed between Phelan and the rest of the leadership of Othentec UK, including Nims and Doeve. An Othentec UK shareholder meeting was called for January 26, 2006, at which time Phelan was discharged from his positions as Managing Director of Othentec UK and Othentec USA. (J.A. at 600-01.) Phelan and Martens have continued to do business in the United States as EC4 USA. (J.A. at 604.)

For their part, Appellants claim that Phelan was picked to head up the effort to market and distribute Orasee's technology in the United States. To this end, Appellants claim that Phelan was clearly and explicitly authorized and instructed to form Othentec USA as Othentec UK's American branch. (Appellants' Br. at 8.) Appellants assert that Phelan was never authorized to found EC4 USA, and that he did so on his own initiative, without permission, consent, or

---

[2]The withdrawals were as follows:

| | |
|---|---|
| September 8: | $29,980 |
| October 6: | $160,000 |
| November 15: | $40,000 |
| November 30: | $75,000 |
| January 3: | $80,000 |

(J.A. at 835; 857-58.)

knowledge from any other parties involved in Othentec UK. *Id.* Appellants claim that when they did learn of EC4 USA's existence in summer 2005, they had no knowledge that it was (a) actively marketing Orasee technology in the United States, and (b) that it was diverting funds from Othentec UK for this purpose. *Id.*

According to Appellants, Doeve had to do all the work himself to incorporate Othentec USA in Virginia, since Phelan had failed to do this as instructed. *Id.* at 9. When Appellants were told by the investor Eldred in July 2005 that he had been putting money into EC4 USA, they claim that they confronted Phelan about this, but that Phelan lied and told them that was only Eldred's "wish list" and that no money had actually been received. *Id.*

Regarding the financial withdrawals from Othentec UK's bank account, Appellants claim that they signed off on all withdrawals because they believed it was going to Othentec USA. Appellants specifically claim that "Doeve was unaware that any funds were being transferred to or used by EC4 USA, a U.S. corporation not affiliated with Othentec UK or EC4 UK. EC4 US[A] was not identified in these requests, which appeared to be for transfers to an Othentec account." *Id.* at 11.

Appellants claim that it was not until December 2005, when an Othentec UK accountant was trying to reconcile certain finances before the end of the year and obtained a bank record of an account registered to EC4 USA, that they realized that Phelan had been using Othentec UK money to finance EC4 USA. *Id.*

Appellants allege that in December 2005, they learned that Phelan had, unbeknownst to anyone else at Othentec UK, directly contacted Orasee investors and made statements critical of Nims in order to undermine Nims. *Id.* at 12. After Phelan requested another withdrawal in the amount of $190,000,[3] Appellants denied this request, and

---

[3]There is no objective evidence of a $190,000 request anywhere in the record. In Nims' deposition, he stated, "I believe there are documents that you ought to have in your record, because I seem to recall seeing them, of Jeffrey's e-mail and his break-out list of where the 190,000 was

informed Phelan that $45,000 was all they could give him. (J.A. at 728.) After this incident, Appellants allege that Phelan refused to attend a meeting in Atlanta to discuss the financial statuses of the various corporate entities involved. (Appellants' Br. at 12.)

Essentially, then, Appellants' claims are that Phelan, assisted by Martens, abused his position of power and trust with Orasee, EC4 UK, and Othentec UK to fraudulently form EC4 USA as a corporation that only he had control over, and to then proceed to use both Othentec UK's money and its trade secrets to start a successful business in which EC4 UK, Othentec UK, and Othentec USA had neither control nor a financial stake.

According to Appellees, however, Phelan was expressly authorized to form EC4 USA, and Nims, Doeve, and others at Othentec UK were fully informed of and involved in this process. (Appellees' Br. at 6.)

In the fall of 2005, Appellees claim that they discovered that many of Orasee's useful patents had been abandoned by Nims' "failure to prosecute and perfect application and failure to pay the required maintenance fees." *Id.* at 7. Phelan claims that upon discovering this, he worried that this may have a material impact on the long-term viability of the various corporations involved, as well as possibly rendering material statements made to investors false. *Id.* at 8. When Phelan tried to question Nims about this, he claims that Nims became enraged, and out of retribution, called the January shareholders meeting (without providing notice to Phelan, even though Phelan was a shareholder) and had Phelan removed from his positions with EC4 UK and Othentec UK. *Id.*

At this point, Phelan asserts that Eldred still wanted to fund EC4 USA to protect his existing investment. *Id.* at 9. However, Appellees

going generally." (J.A. at 728.) Nims may have in fact been referring to an e-mail sent by Phelan to Dindyal on December 8, 2005, requesting $128,861.00, and giving a breakdown of where that money would be going. (J.A. at 865.) On December 14, Doeve responded via a memorandum to Phelan informing him that he would be receiving $45,000. (J.A. at 867.)

claim that since most of Othentec's useful patents had expired, and that the Orasee technology was mostly based on obsolete photographic and printing technology and techniques instead of more modern computerized technology, there was no market for Orasee's technology. In accordance with Eldred's wishes, EC4 USA then had to "start from scratch" and develop new technology on its own to compete in the market for tamper-proof identification cards. *Id.* at 9-10. Defendants claim that they have developed this new technology on their own, and this is what EC4 USA uses today.

Appellants initially brought this action on February 17, 2006, filing claims against Appellees for: (1) violating the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4); (2) violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; (3) violating the Virginia Computer Crimes Act ("VCCA"), Va. Code § 18.2-152.3; (4) violating the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336; and (5) breach of fiduciary duty. (J.A. at 23.) In response, Appellees asserted four state-law counterclaims, none of which is germane to the issues before this court.

On July 21, 2006, the Defendants moved for summary judgment. (J.A. at 322.) The court deferred consideration of this motion until after discovery had been completed. (J.A. at 507.) Defendants then renewed this motion for summary judgment on September 28, 2006. (J.A. at 522.) On September 29, the Plaintiffs filed a motion for summary judgment of their own. (J.A. at 634.)

On October 20, the district court judge, The Honorable Claude M. Hilton, held a hearing at which he granted the motion for summary judgment, stating that "there simply isn't any evidence" to support the VCCA claim and that "there is no evidence in this case to go forward" on the VUTSA claim, and thus dismissed them both. (J.A. at 1181-82.) He also ruled that there was insufficient evidence to support the two federal causes of action, and therefore granted summary judgment on the CFAA and RICO claims as well. (J.A. at 1181-82.) This left only the breach of fiduciary duty claim and the four counterclaims to be adjudicated.

At this point, the case was transferred to Senior District Judge The Honorable Leonard D. Wexler, who was sitting by designation from

the Eastern District of New York. After determining that the breach of fiduciary duty claim and all four counterclaims were exclusively governed by state law, Judge Wexler determined that the federal courts no longer had subject matter jurisdiction over these claims and declined to exercise supplemental jurisdiction. (J.A. at 1196.)

On December 5, 2006, Plaintiffs filed a Notice of Appeal regarding the district court's decision to grant Defendants' Motion for Summary Judgment. (J.A. at 1197.) Plaintiffs amended this Notice on December 7. (J.A. at 1199.) Plaintiffs are not pursuing an appeal of the district court's grant of summary judgment on the RICO and CFAA claims, and are only claiming that summary judgment was wrongfully granted on the VCCA and VUTSA causes of action.

## II.

"We review a district court's grant of a motion for summary judgment *de novo*." *Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 646 (4th Cir. 2004). "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 190 (4th Cir. 1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "To prevail on a motion for summary judgment, a party must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Rather, a nonmoving party must produce some evidence (more than a "scintilla") "upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).

III.

The three elements of committing a violation of the VCCA are, according to the statute, (1) using a computer or computer network (2) without authority (3) intending to obtain, embezzle, or convert the property of another. Va. Code Ann. § 18.2-152.3.

Simply put, Appellants have produced no evidence outside of self-serving speculation that Appellees committed a violation of the VCCA. The district court ruled that "there simply isn't any evidence here to go forward with the unauthorized use of computers to commit a crime." (J.A. at 1181.) We agree.

The evidence shows that Phelan was clearly authorized to access the Othentec UK bank account. Furthermore, Phelan's use of a computer was merely incidental to the withdrawal of the money. Phelan did not directly withdraw the money from the account himself with the use of a computer. Phelan would send an email, and on one occasion a physical letter, to Dindyal requesting that the money be withdrawn, and then Dindyal would withdraw the money and send it to Phelan. (J.A. at 860-67.) Doeve himself actually signed off on many of these withdrawals as well. *Id.*

Appellants have also failed to produce any evidence that they disapproved of what Phelan was doing during the time period in question. EC4 USA was incorporated under Delaware law on March 17, 2005. (J.A. at 683.) During the summer of 2005, Phelan was in contact with Eldred regarding investing in EC4 USA, and Eldred contacted Doeve and others at Othentec UK and explicitly told them he had been investing money in EC4 USA. *Id.* The withdrawals in question began in September 2005.

By their own admission, Appellants were aware by November 2005 at the latest that they knew that Phelan had not set up Othentec USA as they claim he had been instructed to do. (J.A. at 684.) Despite this, Phelan continued to make withdrawals from the account, including a request made on November 28 for $75,000 that was explicitly approved by Doeve. (J.A. at 862-63.) The objective evidence in this case, then, shows that Appellants were aware of EC4 USA's existence, aware that Othentec USA had not been founded, and were

aware that Phelan was withdrawing money from the Othentec UK account.

While Appellants persist in their claim that they were not aware that Phelan was using the money to run EC4 USA instead of Othentec USA, Appellants "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale*, 769 F.2d at 214. In the present case, that is precisely what Appellants attempt to do, as they have produced no factual evidence that Phelan used a computer to withdraw funds he was not authorized to withdraw for an illegal or unauthorized purpose. Accordingly, the district court's ruling that "there simply isn't any evidence here to go forward with the unauthorized use of computers to commit a crime" is correct, and we uphold the district court's entry of summary judgment on Appellants' VCCA claim.

## IV.

The Virginia Uniform Trade Secrets Act ("VUTSA") makes it illegal for a person to misappropriate trade secrets from another. Va. Code Ann. § 59.1-336. The statute defines "trade secret" as:

> information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* The statute defines "misappropriation" as:

> Disclosure or use of a trade secret of another without express or implied consent by a person who (a) Used improper means to acquire knowledge of the trade secret; or (b) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means

to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake.

*Id.*

Appellants assert that their developments in lenticular imaging technology were developed by Nims on a proprietary basis and had economic value from being a method of making tamper-proof identification cards that was not widely known. (Appellants' Br. at 20-21.) Appellants also allege that, as Managing Director of both Othentec UK and EC4 UK, Phelan was intimately familiar with Orasee's lenticular imaging technology, and that upon starting EC4 USA, he used this technology even though he was under a fiduciary duty to Othentec UK to limit the use of such technology.

The district court granted summary judgment for Appellees on Appellants' VUTSA claim, ruling that "I find that there is no evidence in this case to go forward that any trade secret was taken and used." (J.A. at 1182.)

Appellants have failed to produce any objective evidence that Appellees misappropriated any of Appellants' trade secrets and used them for EC4 USA. During deposition testimony, Doeve conceded that they had no evidence of this, only inference:

> Q: [S]o you don't know whether any Othentec U.K.'s proprietary and highly confidential software is being used today by EC4 U.S.?
>
> A: Do I know dispositively? No. Do I have my suspicions? Yes. But, no, in answer to your question, I do not know dispositively what specific lines of code are being used.
>
> Q: And do you know what manufacturing process is being used by EC4 U.S.?

A:    All of my responses—the answer is no. Let me explain. All of my responses are based upon the fact that all of the work that had been imparted from EC4, from Orasee—EC4 U.K., Orasee, and Othentec U.K. under license is how EC4, Inc., and it's the only way EC4, Inc., could be where it is today.

So unless someone is foolish enough to believe that all that was developed in a clean-room environment without reference to, use of, or attempting to work around, I have no other basis for what I'm stating.

(S.J.A. at 445-46.)

Appellants have not shown any evidence that Appellees were, in fact, using the cylinder, or any manufacturing processes associated with the cylinder, in making identification cards. In trying to survive a motion for summary judgment, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale*, 769 F.2d at 214. As with their claim against Appellees under the VCCA, Appellants' claim under the VUTSA relies exclusively on allegations and inferences instead of any sort of actual objective evidence. While Phelan and Martens did work for Othentec and thus did have access to trade secrets, Appellants were unable to produce any evidence, even after discovery, that EC4 USA was using such trade secrets. Appellants' allegations, speculation, and inference are not enough to survive summary judgment. Accordingly, we uphold the district court's ruling that "there is no evidence in this case to go forward that any trade secret was taken and used." (J.A. at 1182.)

V.

Based on the reasoning above, we affirm the district court's entry of summary judgment for Appellees.

*AFFIRMED*