**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 11-1476**

—————————

CHUCKWUDI PERRY,

             Plaintiff – Appellant,

      v.

DAVID KAPPOS, Secretary of Commerce for Intellectual
Property and Director of the United States Patent and
Trademark Office,

             Defendant – Appellee,

      and

GARY F. LOCKE, Secretary, United States Department of
Commerce, United States Patent and Trademark Office,
Agency,

             Defendant.

—————————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. James C. Cacheris, Senior
District Judge. (1:10-cv-00167-JCC-TCB)

—————————

Argued: May 17, 2012                    Decided: June 13, 2012

—————————

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

—————————

Affirmed by unpublished opinion. Judge Diaz wrote the opinion,
in which Judge Wilkinson and Judge Floyd joined.

—————————

**ARGUED:** Stephen Z. Chertkof, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, PLLC, Washington, D.C., for Appellant. Julie Ann Edelstein, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Douglas B. Huron, HELLER, HURON, CHERTKOF & SALZMAN, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, R. Joseph Sher, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

The U.S. Patent & Trademark Office ("USPTO") terminated the employment of Chuckwudi Perry. Perry responded by filing suit, alleging that the USPTO discharged him in contravention of the Rehabilitation Act of 1973 and Title VII. The district court granted summary judgment in favor of the USPTO. On appeal, we conclude that Perry's Rehabilitation Act claim fails because he is unable to establish that he is disabled under the statute. Perry's Title VII claim similarly lacks merit, as Perry has not shown a causal relation between his alleged protected conduct and the termination of his employment. We therefore affirm the judgment of the district court.

I.

A.

Perry suffers from vision problems. He has no vision in his left eye and reduced vision in his right eye. Perry's ailments have caused a "lack of depth perception, frequent sudden degradation of vision in [his] right eye, and inability to distinguish subtle color changes." J.A. 239. With the use of corrective devices, however, Perry is able to perform critical tasks. He has obtained a Maryland driver's license and even feels comfortable traversing certain routes at night, provided they are familiar and well lit. Perry can moreover

3

"read efficiently" with the use of magnifying glasses and straight-edge devices. Id. In the workplace, Perry reports that the "cumulative effects" of his conditions "frequently leave [him] fatigued and needing to take a break or rest before continuing work." Id. Although Perry can perform an office job that requires him to work primarily at a computer, his vision problems render him "less efficient than able-bodied persons." Id. 240.

On January 22, 2007, Perry joined the USPTO as a patent examiner. Despite his vision problems, Perry "was able to perform the essential functions of his patent examining position." Id. 258. Indeed, Perry was even able to drive himself to and from the local Metro stop each workday. While employed at the USPTO, Perry suffered complications with his eyesight that required continuing medical treatment. He sought a flexible schedule from the USPTO, allowing him to miss normal work hours to tend to his medical needs and make up the lost time at night or on the weekends. Perry claimed that none of his supervisors responded to his requests in a meaningful manner.

Soon after joining the USPTO, Perry became involved in a dispute about his salary. On January 29, Perry emailed April Irondi, a human-resources employee, to begin the process of securing a pay advance. Irondi told Perry to stop by her office

4

when he had time to talk, and he visited Irondi's office after receiving her response. He claimed that Irondi was on the phone when he arrived at her office. As he approached the door, Perry asserted that Irondi told him to leave immediately and close the door behind him. Irondi later complained to her supervisor about the incident, alleging that Perry had verbally accosted her. Jeffrey Pwu, Perry's supervisor, learned about the incident and confronted Perry. Perry, an African American, believed that Irondi's and Pwu's actions were the result of discrimination against him on the basis of race.

After the incident with Irondi and discovering that the wrong salary grade and step had been entered in his file, Perry contacted Bernice Nesbitt, another human-resources employee, to remedy the problem. Nesbitt directed Perry to speak with Irondi. Perry responded in a February 6 email that he had "had problems with Ms. Irondi and [he did] not want to deal with her any more [sic]." Id. 144. He also threatened to file an administrative grievance if employees did not become more solicitous of his requests and complaints.

About a week later, Perry contacted the USPTO's Office of Civil Rights ("OCR") about the incident with Irondi. On February 15, Lisa Dill, the Equal Employment Opportunity ("EEO") specialist at the USPTO, scheduled a meeting with Perry to discuss his concerns about the pay-advance dispute. Perry met

5

with Dill and described his issues with Irondi and Pwu, alleging that the actions of both were racially discriminatory. Perry learned that the OCR would draft an informal complaint, after the issuance of which he would have fifteen days to file a formal complaint of employment discrimination.

Perry testified that he felt pressure from Pwu not to file a formal complaint. According to Perry, Pwu began asking him about the status of his complaint in late February or early March. On the first occasion, Pwu asked Perry, "[W]hat's going on?" and Perry informed him that he was "trying to work through the issues." Id. 167. Pwu told Perry to keep him informed. In a second encounter, Pwu stopped Perry in the hall and again asked, "What's going on?" Id. Perry responded that "everything was fine" because he feared being fired. Id. He explained why he thought Pwu was pressuring him not to file a formal complaint:

> It wasn't so much what he said. It was what he did. He was very--he was constantly wanting to talk with me and get my--get my status or what was happening with this. It wasn't from a standpoint of wanting to help, or at least that, because he really didn't. It was just from the standpoint of wanting to know what was going on and whether or not I was going to file formal.

Id. 176-77. Perry received his Notice of Right to File a Formal Complaint on March 15, but he elected not to formalize his grievances.

Citing Perry's lackluster performance as a patent examiner, Deborah Reynolds, the assistant to the director at the Patent Training Academy, on May 14 filed a request for termination of his employment. Jim Ng, director of the Patent Training Academy, wrote to Perry on May 23 to inform him that he had been discharged. Ng explained that Perry's performance had not "progressed at the expected rate," that he had "routinely" missed due dates and failed to complete assignments, and that his work record "indicate[d] little or no potential for growth and development as a career professional in the USPTO." Id. 129.

B.

Perry responded to his termination by filing a second informal complaint with the USPTO's OCR, alleging that the USPTO had discriminated against him on the basis of race and disability. He subsequently filed a formal complaint of employment discrimination--which repeated the charges made in the second informal complaint--with the Equal Employment Opportunity Commission ("EEOC"). An administrative law judge dismissed Perry's complaint, and the EEOC affirmed.

Perry then filed this action in the U.S. District Court for the Eastern District of Virginia, raising two claims against David Kappos, the director of the USPTO. First, Perry alleged

7

that the USPTO violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., by refusing to grant him reasonable accommodations and intentionally discriminating against him on the basis of his disability--i.e., monocular vision that impaired his ability to perform the major life activities of seeing and working. Second, Perry alleged that the USPTO discharged him in contravention of the antiretaliation provision of Title VII, 42 U.S.C. § 2000e-3(a). He claimed that the USPTO terminated his employment as retaliation for filing an informal complaint of discrimination.

The district court granted Kappos's motion for summary judgment. The court first held that Perry was not "disabled" pursuant to the Rehabilitation Act, foreclosing relief on that claim. As for the Title VII claim, the court found that Perry's filing an informal complaint was mere "opposition" activity under the statute. Because Perry had failed to demonstrate that he reasonably believed that the employment practice he opposed was unlawful, the court found this claim meritless.

This appeal followed.


II.

We review de novo the district court's grant of summary judgment. EEOC v. Xerxes Corp., 639 F.3d 658, 668 (4th Cir. 2011). Summary judgment is appropriate where the moving party

8

"shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the summary judgment stage, the nonmoving party must come forward with more than " 'mere speculation or the building of one inference upon another' " to resist dismissal of the action. Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

III.

Perry first challenges the district court's holding that he does not suffer from a "disability" under the Rehabilitation Act. He argues that his monocularity "substantially limits" the

9

major life activity of seeing.[1]  Because Perry's admissions reveal that he is able to function adequately with the use of corrective devices, he has not established disability under the Rehabilitation Act.  His claim on that score consequently fails.

As a threshold matter, a plaintiff seeking relief pursuant to the Rehabilitation Act[2] for discrimination or failure to accommodate must establish disability.  Edmonson v. Potter, 118 F. App'x 726, 728 (4th Cir. 2004).  To successfully show disability, a plaintiff must prove "(1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major life activity, and (3) that the limitation is substantial."  Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 254 (4th Cir. 2006).  The USPTO does not dispute that Perry has a physical impairment that implicates the major life activity of seeing.  Our analysis thus centers on the third

---

[1] Perry at various times in the litigation has referenced a limitation on the major life activities of working and reading. On appeal, however, he has abandoned the argument with regard to working.  See Appellant's Br. 16 n.2.  As for the major life activity of reading, Perry raises this claim for the first time on appeal and it is therefore waived.  See United States v. Am. Target Adver., Inc., 257 F.3d 348, 351 (4th Cir. 2001).

[2] Given the overlapping standards, we rely on cases construing the Americans with Disabilities Act when resolving claims under the Rehabilitation Act.  Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001).

prong--whether the limitation on Perry's vision is "substantial."[3]

The Rehabilitation Act's substantiality requirement must "be interpreted strictly to create a demanding standard." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2002). Regulations accompanying the Act provide the following definition of the phrase "substantially limits":

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1), amended by 76 Fed. Reg. 16,978 (2011). Plaintiffs claiming disability are required to "have an impairment that prevents or severely restricts [them] from doing activities that are of central importance to most people's daily lives" to meet the substantiality standard. Toyota, 534 U.S. at

---

[3] The ADA Amendments Act of 2008 superseded the Supreme Court's elucidation of the substantiality test in Toyota Motor Mfg. v. Williams, 534 U.S. 184 (2002), and Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999). But as the parties agree, the ADA Amendments Act of 2008 does not apply retroactively to the conduct giving rise to this dispute. See Cochran v. Holder, 436 F. App'x 227, 232 (4th Cir. 2011). Precedent construing the prior version of the statute and regulations consequently governs this case.

11

198. Mindful of the Supreme Court's admonition to interpret the regulations exactly, we have explained that the substantiality prong is intended to "preclude[] coverage of impairments whose effects on a major life activity rise only to the level of a mere difference with the abilities of an average individual." Heiko, 434 F.3d at 256 (internal quotations omitted).

We must take into account mitigating measures when performing the disability analysis. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999) (concluding that plaintiffs, who had 20/200 or worse vision in their right eye and 20/400 vision or worse in their left eye but had 20/20 vision with the aid of corrective lenses, were not disabled for statutory purposes). Indeed, it impermissibly strains the text of the Rehabilitation Act to posit that "persons are to be evaluated in their hypothetical uncorrected state." Id.

Evaluating disability under the Rehabilitation Act demands an individualized, case-by-case analysis, in which plaintiffs point to concrete evidence of their own experience with an impairment. Toyota, 534 U.S. at 198. Such a case-specific inquiry is particularly important when an individual claims disability based on monocularity, as the many variables associated with the condition "are not the stuff of a per se rule." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566

12

(1999).  "While monocularity inevitably leads to some loss of horizontal field of vision and depth perception," acknowledged the Supreme Court, a plaintiff must present evidence showing that his case of monocularity amounts to a substantial limitation on seeing.  Id. at 566–67.  Though the Court counseled that "people with monocular vision 'ordinarily' will meet the Act's definition of disability," such individuals are not excused from the obligation to "offer[] evidence that the extent of the limitation in terms of their own experience . . . is substantial."  Id. at 567.  We have held monocular individuals to the burden articulated by the Court in Albertson's, concluding in one case that a monocular plaintiff had not met the substantiality prong because he had overcome his impairment with the use of corrective devices.  Foore v. City of Richmond, 6 F. App'x 148, 153 (4th Cir. 2001) (unpublished) (explaining that the court was not presented with the "ordinary case" referenced in Albertson's).

Applying these principles to Perry's impairment, we find that he has not demonstrated that he is substantially limited in the major life activity of seeing.  We note initially that our analysis focuses on Perry's global ability to see; it is not confined to his ability to read highly technical documents while examining patent applications at the USPTO.  Nor may we overlook the ameliorative effect of corrective lenses and straight-edge

13

devices on Perry's ability to see. Conducting the disability inquiry at the proper level of generality and taking into account mitigating measures, we conclude that Perry has failed to establish that his monocularity "prevents or severely restricts," Toyota, 534 U.S. at 198, him from seeing.

The record shows that Perry, like the plaintiff in Foore, "has overcome his impairment and is not substantially limited," 6 F. App'x at 153. Indeed, through the use of mitigating measures Perry was able to obtain a Maryland driver's license. He drove himself to the Metro stop each workday, and he could even drive at night along familiar, well-lit routes. Perry was moreover able to "read efficiently" with the use of "magnifying glasses and straight-edge-type devices." J.A. 239. He admitted that his vision problems did not preclude him from "perform[ing] the essential functions of his patent examining position." Id. 258. Although Perry suffered fatigue when reading for long periods of time, we do not deem this--when viewed in conjunction with his ability to read efficiently, drive, and perform all the functions required of him at the USPTO--sufficient to establish that he was "severely restrict[ed]," Toyota, 534 U.S. at 198 (emphasis added), from seeing.

To be sure, the Supreme Court has instructed that monocular individuals "ordinarily" will meet the Rehabilitation Act's definition of disability. Albertson's, 527 U.S. at 567. But we

14

find that Perry has not presented an "ordinary" case, as he has not demonstrated "a disability by offering evidence that the extent of the limitation in terms of [his] own experience . . . is substantial," id.; see also Foore, 6 F. App'x at 153.

Perry's failure to prove disability in this case does not inexorably doom possible future claims under the Rehabilitation Act. Disability determinations are inherently fluid, changing as a plaintiff's underlying conditions improve or deteriorate. Should Perry's vision continue to decline and lead to greater impediments in his daily life, he might be able to obtain relief in a later action.

IV.

We turn next to Perry's Title VII retaliation claim. The parties and the district court focused on whether Perry's filing of an informal complaint qualified as participation or opposition activity under the statute. But we need not resolve that issue to decide this case. See Seremeth v. Bd. of Cnty. Comm'rs, 673 F.3d 333, 337 n.2 (4th Cir. 2012) (recognizing that a circuit court may affirm on grounds different from those on which the district court relied). Because Perry has failed to demonstrate a causal link between the filing of the complaint and his discharge, we conclude that he has not raised an actionable retaliation claim under Title VII.

15

Title VII's antiretaliation provision forbids an employer "to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Under the familiar burden-shifting model, the plaintiff must establish a prima facie case of retaliation. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). To meet this initial burden, the plaintiff must satisfy a three-part test: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him; and (3) there was a causal link between the two events. Id. at 405-06. Our analysis here is confined solely to the third prong of the formulation.

Save for situations in which the adverse employment decision follows the protected activity "very close[ly]," "mere temporal proximity" between the two events is insufficient to satisfy the causation element of the prima facie requirement. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) (internal quotations omitted). Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was "too long to establish a causal

16

connection by temporal proximity alone," Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished). Even a mere ten-week separation between the protected activity and termination "is sufficiently long so as to weaken significantly the inference of causation between the two events." King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003). Where the time between the events is too great to establish causation based solely on temporal proximity, a plaintiff must present "other relevant evidence . . . to establish causation," such as "continuing retaliatory conduct and animus" in the intervening period. Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007).

Perry may not rely on temporal proximity alone to establish the requisite nexus of causation. Perry first contacted Dill, the EEO specialist, on February 14, 2007 about filing an informal complaint, more than three months before he was discharged, on May 23. Such a three-month lapse is too long to establish causation, without more. See Clark Cnty., 532 U.S. at 273-74 (collecting cases). Even assuming that Pwu did not learn about the complaint until just prior to questioning Perry about it, in late February or early March, roughly ten weeks or more elapsed between that time and the USPTO's decision to terminate Perry's employment. This separation between the two events is "sufficiently long so as to weaken significantly the inference

17

of causation," requiring Perry to present additional evidence of retaliation.  See King, 328 F.3d at 151 n.5.

This he has not done.  In fact, Perry has presented no evidence that any supervisors at the USPTO displayed animus toward him or otherwise retaliated against him in the time between his filing the informal complaint and the termination of his employment.  Perry testified that Pwu was "uncharacteristically aggressive" about checking the status of his complaint and twice asked him whether he had filed a formal complaint.  J.A. 176.  Perry assigns nefarious motives to Pwu's questions about the complaint, attempting to convert Pwu's actions from those of a solicitous supervisor to those of a boss scheming to thwart the exercise of federally recognized rights.  At the summary judgment stage, however, we will not allow the nonmoving party to " 'create a genuine issue of material fact through mere speculation or the building of one inference upon another.' "  Othentec, 526 F.3d at 140 (quoting Beale, 769 F.2d at 214).  Because Perry has not come forward with any evidence to establish causation beyond temporal proximity, we find that he has not met his burden to establish a prima facie case of retaliation.

V.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>